On November 13, 1947, plaintiff, for the price of $8,500.00, purchased from the defendant a lot of ground in the City of Shreveport, Louisiana, with a new five-room residence thereon, which had been recently built by the defendant for sale. Plaintiff moved into the house the fourth day after deed was passed. The building very soon thereafter developed the vices and defects hereinafter stated, which, not being remedied by the defendant after demand, provoked the institution of this suit.
Plaintiff alleged that because of nonapparent defects in the house at the time he purchased it, due to "inferior and inadequate workmanship and materials", the property had not then a value in excess of $6,000.00. As regards the defects to which referred, he specifically alleged that the entire floor of the house has sagged and become uneven; that the sagging of the floor has brought about the following developments, to-wit:
The partition walls have become separated from the ceiling and floor; doors drag and do not properly fit in their frames; the cement joints between sections of sheet rock in the walls and ceiling have in places broken. In addition to the above enumerated conditions, plaintiff also alleged that the rear door of the building has warped so badly that rainwater enters through it; that the rear concrete steps have slipped downward from their proper position, and the doors of one of the kitchen cabinets have so badly warped as to be useless. Finally, he alleged that to "remedy the conditions set forth" will require the expenditure of $2,000.00. However, he prayed for judgment for $2,500.00 on this account but prior to beginning of trial, in open court, reduced his demand to $2,000.00.
Defendant denied articulately the allegations concerning the alleged defects in the building at the time it was purchased by the plaintiff, and further avers that if the building has developed the conditions described by plaintiff, the same are due entirely to his own acts after buying and taking possession of the property; that when the house was erected the foundations thereof were constructed and arranged in the manner designed by a competent architect, so that its weight would be equally distributed, but that plaintiff has altered the set-up by installing over the partition separating the west front room from the kitchen, a central attic heating furnace weighing approximately 340 pounds; that the added weight of this furnace has caused a center foundation pier to sink and settle, to which the sagging of the floor with consequent results is attributable.
Plaintiff's demand was rejected and his suit was dismissed at his cost. He appealed to this court.
Defendant objected to the introduction of any testimony to prove the essential allegations of the petition, on the ground that same were too vague and indefinite to admit of proof. The objection was overruled. It is urged in this court.
While it may be conceded that the petition to some extent is deficient in precision of allegations, yet a fair appraisal of it as a whole leaves no doubt with respect to what plaintiff is seeking, and the grounds therefor. These allegations clearly disclose that he bought the house and that within one year, Article 2534 of Civil Code, thereafter latent defects of a material character developed therein that had the effect of diminishing the value of the property to a substantial extent.
After stating the nature and character of the defects that allegedly diminish the value of the property, plaintiff further alleged:
"In order to remedy the conditions set forth in the preceding paragraph, your petitioner would be required to pay at *Page 519 
least Two Thousand and No/100 ($2,000.00) Dollars."
This obviously means that to remedy the alleged developed defects and bring the building's physical condition to the status it should have had, and was believed by plaintiff to have had when he purchased it, an expenditure in the sum of $2,000.00 will have to be made. This amount is the measure of the alleged shrinkage in value due to said defects. This, of course, relates back to the allegations that the defects "consisted of inferior and inadequate workmanship and materials" employed in erecting the building.
As we construe the petition, this action, in effect, is one in diminution of the purchase price, or quanti minoris, authorized by Articles Nos. 2541 to 2544, inclusive, of the Civil Code. Article No. 2541 and 2544 read as follows:
"Whether the defect in the thing sold be such as to render it useless and altogether unsuited to its purpose, or whether it be such as merely to diminish the value, the buyer may limit his demand to the reduction of the price.
* * * * * *
"The action for a reduction of price is subject to the same rules and to the same limitations as the redhibitory action."
These articles of the Civil Code, it has been held, have application to sales of realty as they do to personalty. De Armas v. Gray et al., 10 La. 575, 579. These articles and others of the Civil Code leave no doubt on this subject.
In Morehouse Ice Company, Inc., v. Tooke Reynolds, La. App., 154 So. 402, 405, this court said:
"Whether the purchaser sues for a reduction of the price eo nomine, the measure of which is the difference in value of a sound and unsound article, or whether he sues for the amount necessarily expended by him to convert the unsound article into one of soundness, is a distinction without a difference."
This statement is apropos here.
It is a well fixed rule of law and equity that in order to determine its true character and the nature of the relief sought, a court should and will look to the substance of a demand, rather than address itself to technicalities; and that a litigant seeking the aid of the court to enforce a right will not be turned away, even temporarily, on account of inartful pleading unless no other course is open to it. We are of the opinion that the trial judge's ruling on the objection was correct, and it is approved.
Two theories are advanced to account for the sagging of the floors. One is that the concrete pier above and about which the sagging is most pronounced, because of the unstable and damp character of the soil, has, from the weight of the house, sunk. The other theory, not set up, however, in answer, but in argument, is that the partition walls were not erected directly above the sills, and the weight of the building resting thereupon, augmented by the weight of the attic furnace and attachments, has caused the floor joists to bow.
Prior to the construction of the building the Federal Housing Administration made commitment to underwrite a loan by defendant on the property to the amount of $6,700.00.
Strange as it may seem, the testimony is contradictory as concerns the exact cause or causes of the floor's sagging. Several witnesses of long experience in the constructing and sale of frame buildings examined the house involved in this case, but they all do not agree as to the cause of the trouble; and their testimony, with little or no dissent, proves that plaintiff has not in his petition exaggerated the character and extent of the developed defects.
E. M. Freeman, a civil engineer of the City of Shreveport, of twenty years experience, who specializes in structural phases of his profession, examined plaintiff's building not long before date of trial, and testified in support of the first named theory, that is, that the sagging of the floors is attributable to the sinking of piers, especially one of those about the center of the building. He evidently did not observe, if such be true, that the partition walls were not erected over the sills. *Page 520 
The cause of the floor's sagging is described by him as follows:
"Inadequate foundation. Meaning, specifically, unstable soil conditions."
He also was asked to state what should be done to remedy the bad condition he found to exist, and replied:
"I think some supplemental footings; some additional piers; the introduction of certain structural wood supports; some additional sills and some joists here and there, properly placed; together with the necessary refinishing of the interior."
There appears no sound reason whatever for not accepting Mr. Freeman's testimony at full face value.
Sidney M. Hoover, an architect, a graduate of Tulane University, was in the employ of the FHA prior to and at the time the house was constructed. Mr. E. G. Robbins, Chief Underwriter of the FHA in the Shreveport area, heard of the developed defects in the building through complaints of plaintiff, and communicated this knowledge to Mr. Hoover, who then visited the building and testified that he made close examination thereof. It was his opinion that the foundation, including joists, sills and piers, was entirely adequate for this building and any other building of its kind. He testified without objection, and contrary to allegations of the answer, that the sagging of the floors is attributable to the partition walls not having been erected immediately above the sills, and to the added weight of the attic furnace and equipment. He said the floor joists, from the weight of the partitions and attic furnace, have bowed. However, he and Mr. Robbins are each certain that the house was constructed strictly in keeping with the plans and specifications submitted by defendant to and approved by the FHA prior to its commitment to underwrite the loan. When asked what was necessary to correct and stop further sagging of the floors, Mr. Hoover answered:
"I recommended a supplemental row of sills at mid-center span of each of the three 4-joist spans, so as to run parallel to the present sills, and special piers to support these."
Everyone knows that the main function of foundation sills of a frame building is to sustain the weight of partition walls that should rise perpendicularly above them. Yet, Mr. Hoover and Mr. Robbins testified that this building, after being finally completed was approved as to construction and accepted for insurance by the local representatives of the FHA in keeping with the original commitment. Hoover's testimony as to the cause of the sagging is corroborated by that of a contractor and builder of many years experience.
Had timely objection been made to the admissibility of the testimony offered to prove that the floors sagged from improper location of the partition walls, it would doubtless have been sustained as being in contradiction of the defense set up in the answer that the sagging is due to the sinking of one or more piers because of the weight of the attic furnace. All things considered, we conclude and hold that Freeman's testimony on this phase of the question should be accepted. It is not only supported by reason, but by defendant's own answer.
The plans and specifications for said building provided that the piers be sunk into the earth's surface a sufficient depth to insure stable foundation, but Mr. Hoover testified that he found but one of the existing piers extending below the earth's surface. It is shown that the soil upon which the building was erected is unstable from excessive water content. It is not considered first-class for foundation piers. Of course, there are several ways by which this deficiency could have been overcome.
Under the title "Of The Obligations Of The Seller", in the Civil Code, Articles Nos. 2474, 2475 and 2476, appear. We quote the last two of these, to-wit:
"The seller is bound to two principal obligations, that of delivering and that of warranting the thing which he sells.
* * * * * *
"The warranty respecting the seller has two objects; the first is the buyer's peaceable possession of the thing sold, and the second is the hidden defects of the thing sold or its redhibitory vices." *Page 521 
It will be observed from the language of the last quoted article that the seller warrants the thing sold against "hidden defects * * * or its redhibitory vices." It is clear that if a house pier is erected upon an unstable foundation the defect is "hidden", within the meaning of the quoted article and is not discoverable upon simple inspection. The defect in this case did not develop until after plaintiff moved into the building. He gave the building the sort of inspection usually given by one who is purchasing a new home. Naturally, he assumed that since the FHA had guaranteed a loan against the property it had been competently constructed.
It goes without saying that if a new frame building requires the additions enumerated by either Mr. Freeman or Mr. Hoover to put it in proper physical condition, the original workmanship was both inadequate and incompetent. It was said in Barraque v. Neff et al., 202 La. 360, 11 So.2d 697, that the fact that the walls cracked so soon after the building was completed created a presumption of the use of poor material or the employment of bad workmanship. And, so the same may be said in the case before us.
The De Armas case, supra, was decided over one hundred years ago. Diligent research has not revealed another case in our jurisprudence which rests exactly upon the principle involved therein. The Morehouse Ice Company case, supra, is the nearest approach to it. Many cases are found wherein the law governing the relationship between building contractors and those for whom they have built, were applied, but these are not very helpful in the present case. The De Armas case, though standing alone, we believe to announce good law and is controlling in the case at bar. This is clearly reflected from the paragraphs of the syllabi which we quote, to-wit:
"An allegation, that the defendant sold to the plaintiff a house, with warranty, and that a part of it had fallen in ruins, on account of the badness of its construction, sets forth a cause of action, sufficient to authorize a recovery.
"Where there is a defect in the wall of a house, which is not declared, and is not apparent, the vendee will be entitled to a diminution of the price, proportionate to the injury sustained, if soon after the sale the wall falls in ruins."
"The correct standard by which to ascertain the diminution of price is, the costs of repair."
The testimony leaves no doubt that the material of which the building was constructed was of the character generally employed at the present time in the erection of residences in and about the City of Shreveport. It was not "inadequate" for that purpose.
We believe that to the installation of the attic furnace should not be ascribed any real importance in the case. If the foundation piers had been properly and competently buttressed, they would have easily withstood without sinking, the relatively small weight of this furnace, and, in fact, of several more like it.
In passing, we cannot refrain from observing that notwithstanding his personal and financial interest in the outcome of the case, defendant did not testify.
The cost of workmanship and material to correct the sagging condition of the floors and to maintain them in proper position, to repair the walls and ceilings and repaint them, and in other respects to correct the defects enumerated in the petition, is not without uncertainty. One witness said it all could be done for not over $300.00, while another witness testified that the cost will be over $900.00, and he submitted a broken-down statement to support his testimony. The former estimate appears ultra conservative while the latter appears to be too liberal. We have decided to take the average of the two estimates, or $600.00 as a proper basis on which to predicate an award in plaintiff's favor.
Therefore, for the reasons herein assigned, the judgment from which appealed, is annulled, avoided and reversed, and there is now judgment in favor of the plaintiff, Melvin L. Bozeman, and against the defendant, A. P. McDonald, for the *Page 522 
sum of Six Hundred and No/100 ($600.00) Dollars, with legal interest thereon from judicial demand until paid, and for all costs of this suit.
TALIAFERRO, KENNON and HARDY, JJ., sitting.