207 So.2d 405 (1967)
John UNVERZAGT, Plaintiff and Appellant,
v.
YOUNG BUILDERS, INC., Defendant and Appellee.
No. 2165.
Court of Appeal of Louisiana, Third Circuit.
December 21, 1967.
Rehearing Denied January 18, 1968.
*406 Pugh, Buatt, Landry & Pugh, by J. W. Landry, Jr., Crowley, for plaintiff-appellant.
Bean & Rush, by Warren D. Rush, La-fayette, for defendant-appellee.
Before SAVOY, CULPEPPER and LEAR, JJ.
CULPEPPER, Judge.
The plaintiff, John V. Unverzagt, seeks damages in the sum of $15,000 representing the cost of removing and replacing a defective swimming pool constructed under contract by the defendant, Young Builders, Inc. The District Judge found plaintiff had failed to sustain his burden of proving the defects in the pool were due to badness of workmanship or defective materials. From a judgment rejecting his demands, plaintiff appealed.
The evidence clearly shows the pool is now badly cracked and ruined; that it has risen out of the ground in a non-uniform manner, mostly at the deep end; and that the cause thereof is excessive moisture seeping down into "expansive clay" around and under the pool, forcing it up. The substantial issue is whether the principal source of this moisture was water leaking from the pool, as contended by plaintiff, or surface water seeping down from the leaking joints of a subsurface storm drain along the deep end, as contended by defendant.
The general facts show that on August 27, 1964, plaintiff entered into a contract with defendant to construct a swimming pool at the new home which plaintiff was building in Crowley, Louisiana. The price was $5,750.93 for a pool 18 feet wide and 38 feet long, with a filter, skimmers, diving board, ladder and other accessories. There were no detailed plans and specifications agreed to, this being left to defendant's discretion.
Briefly described, the pool was built with a concrete floor, reinforced by 6 × 6 inch #10 gage wire mesh. The sides were fibreglass panels, each 40 inches wide, which were caulked and supported by concrete poured behind. A "truss lock" around the pool fits on top of the panels to hold them in place. On top of this truss is the coping. The pool has a depth of about 9 feet at the deep end, which is toward the south, and 3 feet at the shallow end on the north. A large pebblestone patio, built by another contractor, Mr. Pat Cashman, surrounds the pool. Also, there is a brick wall running along the deep end behind the diving board.
Construction began about December 15, 1964, and ended in March 1965. Before the pool was even completed a crack developed in the concrete floor at the shallow end. This crack was repaired by chipping out about ½ inch of concrete and replacing it with a "water plug" of some type of caulking material. Also, shortly after the pool was completed and filled with water, another crack appeared in the bottom of the pool and was reported by plaintiff to defendant in a letter dated July 14, 1965. This crack was repaired during the month of August, 1965. Shortly thereafter, plaintiff began to notice cracks in the coping around *407 the top of the pool, mostly in the area of the two skimmers located respectively on each side. Also, plaintiff began to suspect that the pool was loosing water through the cracks in the bottom or a crack in the side near one of the skimmers. Accordingly, plaintiff employed Mr. Harold Letz, a registered Civil Engineer of Crowley, Louisiana, to investigate and determine the nature and cause of the trouble.
Mr. Letz conducted an investigation starting on September 17, and extending through December of 1965. He made a written report to plaintiff on December 31, 1965, stating that the top of the pool was rising, more on the deep end than the shallow end, and was carrying with it the adjacent pebblestone patio; that in September there were only 2 cracks extending entirely through the slab, but on his final inspection in December there were 13 such cracks; that the brick fence along the deep end of the pool was cracked and pulled away from the patio, but not to a greater extent than would be normal for this type of construction (i. e., a brick fence 150 feet long without any expansion joints); that plaintiff's contention that the pool was leaking could explain the source of the water which was producing the rise of the pool. Mr. Letz recommended that extensive work be undertaken immediately to stop the leaking from the pool or, if this was impossible, to consider a complete reconstruction of the pool.
Plaintiff forwarded to defendant a copy of Mr. Letz's report. Defendant replied that the source of the water was not leakage from the pool but instead was surface water entering the cracks between the brick wall and the patio and also certain cracks which had developed between the patio and the coping of the pool. Since defendant did not construct the patio or the brick wall, he refused to accept any responsibility for any defects in the pool. Actually, defendant even contends that the pool has never leaked and is not leaking now except when the water level is too high, i. e., above the panels.
After further fruitless negotiations a meeting was held on January 31, 1966, attended by plaintiff, defendant, Mr. Carlton Wood, a swimming pool contractor from Texas, Mr. Pat Cashman, a swimming pool builder from Lafayette, and Mr. Letz.
It was agreed that 2 tests would be performed: (1) a soil analysis to be taken at 2 or 3 locations near the side of the pool; (2) a water level test.
To make these tests, portions of the pebblestone patio were removed at the west side of the pool, near the skimmer, and on the south end (the deep end) of the pool. Mr. Letz testified that after these portions of the patio were removed they added water until it reached the top of the tile, just under the coping, and he observed water leaking in a steady stream from the pool in the area of the skimmer box on the west side. Mr. Letz also performed a water level test by marking with a pencil on the tile and found that in the first 12 hours the pool level dropped about 1½ inches, in the next 12 hours about ½ inch, and in the third 12-hour period, an additional 3/8 of an inch. This satisfied Mr. Letz that the pool was leaking. And, we might add at this point, it should have satisfied anybody.
Mr. Young then employed Dr. Louis J. Cappozzoli, a consulting engineer specializing in soil mechanics and foundation engineering, to investigate. On April 28, 1966, he examined the pool and took two soil samples from borings, about 9 feet in depth, on the south and west sides of the pool respectively, where the 2 sections of the patio had been removed. From these soil samples, Dr. Cappozzoli found the moisture content in the soil on the south end of the pool was greater than that on the west side. The soil was found to be a type of clay which expands with increased moisture content. It was Dr. Cappozzoli's opinion that excessive moisture seeping into the clay on the south end of the pool caused it to expand and exert pressure which resulted in the pool rising out of the ground on the south end. This, he says, caused the cracks in *408 the pool, the coping and the skimmer mechanism.
In searching for a possible source of the water which had seeped into the clay under the south end of the pool, Dr. Cappozzoli found an underground storm drain, made of 6 inch clay pipe and immediately concluded that this must be where the water was coming from. This storm drain was constructed under the patio by a local plumber, in accordance with plans drawn by Mr. Letz. It consisted of 6 inch clay pipe which ran generally along each side of the pool to another line along the south end of the pool and from this into the city drainage system on the street. There were 4 drains from the patio down about 1 foot into this pipe. Mr. Letz testified that it would take 5.8 inches of rain per hour to fill this storm drain; it was not designed to be water tight; it leaked a little at the clay pipe joints, but this would be only during heavy rains and clearly would not be sufficient to cause the trouble; that steady leakage from the pool into the sand backfill around the sides and through this sand down to the deep end of the pool was the only logical source of the water.
To prove that the storm drain leaked, defendant performed a test. He blocked the lower end and filled the pipes and drains with water up to the level of the patio. It leaked about 5 gallons in 37 minutes under these abnormal conditions. Dr. Cappozzoli opined that this was the initial cause of the trouble and that as the clay progressively expanded it caused the pool to rise progressively and also caused cracks in the patio and along the brick wall, which in turn allowed more surface water to seep down into the subsurface clay and aggravate the situation further.
With regard to soil conditions generally, Dr. Cappozzoli testified that this type of expansive clay is usual and normal in the Crowley area, which necessarily implies that any builder knows or should know of these conditions. The doctor also testified that where any excavation is made for construction purposes, a slight movement of the soil should be expected during construction. Hence, any slab should be strong enough to withstand this normal soil movement.
At the trial, plaintiff introduced testimony of 3 experts, experienced in pool construction. Mr. Pat Cashman, President of Swimming Pools, Inc., of Lafayette, has been building pools in south Louisiana for about 12 years. He testified that in this area it was necessary to reinforce the concrete slab with steel rods, of either 3/8 or ½ inch diameter, in addition to 6 × 6 #10 mesh steel wire. It was his opinion the pool in question here, which had no reinforcing rods, but only 6 × 6 #10 mesh, was insufficient.
Furthermore, Mr. Cashman built the patio around plaintiff's pool and observed the construction thereof. He stated that after the pool was completed it was left "virtually empty", that is, with only 3 feet of water in the deep end, for several days and that this was a very hazardous thing to do. (Due to the great normal moisture content of soil in the area a pool may "float up out of the ground when empty".) He observed the crack across the bottom of the pool before construction was completed and said it went all the way through the slab. He later actually tested the water loss in the pool by making pencil marks on the tile and found the pool was definitely leaking. It is his opinion that the cause of the trouble was improper workmanship in the construction of the pool which resulted in its cracking and leaking.
Mr. Carlton Wood, President of Coastal Swimming Pool Company of Beaumont, Texas, has been in the business for about 13 years. He was present at the meeting held on January 31, 1966, and at the test for water leakage held immediately thereafter. He says the pool lost 1½ inches of water in one night and definitely leaked at that time. It was his opinion that the principal leakage was around the skimmers and where the panels on the sides of the pool near the *409 skimmers were cracked. He stated that the skimmers probably had not been installed properly. Furthermore, he said that in this area 6 × 6 mesh was not sufficient reinforcing for the floor and that steel rods, of at least 3/8 inch in diameter, must be used. Hence, he was of the opinion that there was badness of workmanship which caused the pool to crack. He further stated that he thought it was impossible for the storm drain to leak enough to cause this trouble. He pointed out that the storm drain would never be completely full of water and that there would be only a small amount of leakage from the clay pipe joints during heavy rains and this would not be sufficient to cause the trouble here.
Mr. James R. Holloway was working as Sales Manager for defendant at the time this pool was constructed, but since that time he has formed his own pool company. The substance of his testimony was that when he examined the pool during the fall of 1966 he found all of these various defects which have been discussed above. However, he would express no opinion as to the cause thereof or that they were the result of badness of workmanship or defective materials.
As stated above, the substantial issue is whether the initial cause of the trouble was water leaking from the pool, either through the cracks in the concrete or from defects in the skimmer, as contended by plaintiffs; or whether it was water leaking from the storm drain constructed of 6 inch clay pipe. The trial judge apparently found the evidence about evenly balanced between these 2 contentions and concluded that plaintiff had failed to sustain his burden of proving badness of workmanship or defective materials. We think this is erroneous. The testimony of plaintiff's experienced experts in pool construction, particularly Mr. Cashman and Mr. Wood, as corroborated by the clearly preponderating evidence that the pool cracked and leaked progressively from the time it was constructed, outweighs the theories advanced by Dr. Cappozzoli. According to plaintiff's experts, the pool was improperly constructed in that the slab was not reinforced with steel rods, in addition to wire mesh. Even Dr. Cappozzoli testified that a certain amount of soil movement must be expected in any excavation. Hence, the slab must be strong. The soil under the pool did in fact move and cause the slab to crack. A clear preponderance of the evidence shows that the cause of the trouble was leakage from the pool rather than the small amount of leakage from the storm drain running along the deep end.
Turning now to the issues of law, we find the plaintiff contends first that this case is controlled by jurisprudence that defects in new construction create a presumption of the use of poor materials or the employment of bad workmanship.[1] We find it unnecessary to decide whether such a presumption exists in the present case. For, we think the evidence clearly shows there was bad workmanship.
The applicable law is set forth in the recent case of Wurst v. Pruyn, La., 202 So.2d 268 (1967). There, defendants, developers of a residential subdivision, built a house for plaintiff on one of their lots and sold it to him. Within a few months the concrete slab foundation began to sink, causing cracks in the floors, walls, ceilings, etc. The expert testimony showed that the cause was several large trees close to the house, absorbing moisture and causing soil shrinkage under the slab. The court held that the relationship between plaintiff and defendant was not one of vendor-vendee, in which legal principals relating to redhibition would apply.[2] It *410 found instead that this was a building contract controlled by LSA-C.C. Art. 2762.[3] In the course of the decision, it is pointed out that in the French Code (C.N.1792) the builder was held responsible for "defects in the soil" but this provision was omitted from our own Civil Code Article 2762. Hence our jurisprudence has long recognized that generally the builder is not responsible for defects in the soil. However, the court held this means only latent defects and not those which are apparent and were known, or should have been known, to the builder. Thus, it was held that there was no latent defect in the soil but, instead, the cause of the trouble was the presence of too many large trees near the concrete slab, a condition which was readily apparent and should have been known to the builder. The builder's failure to take the necessary steps to prevent this shrinkage of the soil under the slab, or to construct the slab strong enough to withstand it, was held to be "badness of workmanship", for which the builder was responsible.
Applying the law, as set forth in Wurst v. Pruyn, supra, to the present case, we find that the agreement for the construction of this pool was a building contract. Hence, the plaintiff must show that the defects are due to badness of workmanship or defects of material, rather than any latent defect in the soil, architect's plans or other cause for which the builder is not responsible. As to the soil, defendant does not contend, and certainly the evidence does not show, that there was any latent defect in the soil. Even defendant's own witness, Dr. Cappozzoli, testified that this expansive type of clay is usual and normal in the Crowley area. As to the plans, these were furnished by defendant himself. As stated above, we think plaintiff has shown the cause of the defects was badness of workmanship.
Essentially, the issue here is factual, i. e., whether the initial source of the water, which caused this clay to start expanding, was leakage from the pool or leakage from the storm drain. As stated above, we find the evidence clearly shows that the pool cracked and began to leak soon after construction and that this condition became progressively worse and caused the ultimate ruin of the pool. The defendant, builder, is therefore responsible in damages.
As to the quantum of damages, the evidence shows that the pool cannot be repaired but will have to be removed and replaced. Mr. Holloway said this would cost $15,000. Mr. Wood estimated the cost at $12,000 to $13,000. Mr. Cashman put the cost at $15,000. Under this testimony, an award of $14,000 is justified.
For reasons assigned, the judgment appealed is reversed and set aside. It is now ordered, adjudged and decreed that there be judgment herein in favor of the plaintiff, John V. Unverzagt, and against the defendant, Young Builders, Inc., for the sum of $14,000, together with legal interest thereon from date of judicial demand until paid, and all costs, both in the lower court and of this appeal.
Reversed and rendered.

ON DEFENDANT'S APPLICATION FOR REHEARING
EN BANC.
PER CURIAM.
In an application for rehearing counsel for the defendant, Young Builders, Inc., *411 states that we erred in construing the testimony of Mr. Letz. As is set forth in our opinion, Mr. Letz made an investigation of the pool during the period September 17, 1965, through December, 1965, and then made a written report to plaintiff, of date December 31, 1965, from which we now quote as follows:
"At initial observation there were only two cracks extending entirely through the slab. At final observation there were thirteen such cracks, and in addition the northeast corner had spalled off for a distance of about one foot, and to a depth of one-eighth to one-quarter of one-inch."
However, it has now been pointed out to us in defendant's application for rehearing that from his testimony at the trial it is apparent Mr. Letz did not mean these cracks found in 1965 were in the bottom of the pool. The "slab" he referred to was the coping. We have now reviewed the record and construe the testimony of Mr. Letz as follows: In September of 1965 he found the coping (concrete trimming around the top of the pool) cracked in 2 places; on December 15, 1965, he found the coping had cracked in 13 places, because the pool was rising up out of the ground, but he found no cracks in the bottom of the pool; since the coping, and certain panels of the patio, were cracking principally in the vicinity of the skimmers, he suspected in December of 1965 that water was leaking from the pool through some defect in the skimmers (Tr. 203); these suspicions were confirmed by the tests made in January of 1966 when portions of the patio were removed and Mr. Letz observed water coming out from the side of the pool near the skimmers; in December of 1966 he found approximately 20 cracks in the coping, one crack extending all the way across the bottom near the shallow end of the pool, 2 other cracks in the bottom extending out from this long crack, and still another crack in the bottom of the pool on the west side at about the center (Exhibit P-23 at Tr. 66).
Although this re-evaluation of the testimony of Mr. Letz shows that he did not report any cracks in the bottom of the pool during 1965, our decision remains the same. For, even though Mr. Letz did not mention it, there was admittedly at least one crack which appeared in the bottom of the pool soon after its construction and which was repaired by defendant's employees with a "water plug". Furthermore, Mr. Letz definitely found that the pool was rising up out of the ground during the period September 17, 1965, to December 31, 1965. It was in this period that the number of cracks in the coping increased from 2 to approximately 13. Due to the fact that most of these cracks in the coping, as well as those in the panels of the patio, were in the vicinity of the skimmers, Mr. Letz suspected in December of 1965 that the skimmers were leaking. After the tests were made in January or February of 1966, Mr. Letz stated that his original suspicions were confirmed and that he thought the pool was definitely leaking around the skimmers.
Of course, Mr. Letz testified that finally by December of 1966 the bottom of the pool had cracked in several places, as is shown by the report of his investigation made in December of 1966.
We have carefully examined the remaining contentions in defendant's application for rehearing and find they have no merit.
For the reasons assigned, the application of the defendant appellee for a rehearing is denied.
Application of defendant for rehearing denied.
FRUGEé, J., votes for rehearing.
HOOD, J., is of the opinion that a rehearing should be granted.
NOTES
[1] Fremont v. Harris, 9 Rob. 23; Barraque v. Neff, 202 La. 360, 11 So.2d 697 (1942); Bozeman v. McDonald, La.App., 40 So.2d 517 (2d Cir. 1949).
[2] Chatelaine v. Globe Construction Co., 229 La. 280, 85 So.2d 515 (1956); Matthews v. Rudy, 4 La.App. 226 (1926); Comment, 7 La.L.Rev. 564 (1947).
[3] 
 "Art. 2762. Liability of contractor for
 damages due to badness of
 workmanship

"Art. 2762. If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks."