139 So. 774

JUNG et al. v. GWIN.

No. 31215.

Jan. 4, 1932.

Rehearing Denied Feb. 1, 1932.

Milner & Porteous and P. M. Milner, all of New Orleans, for appellant.

A. D. Danziger, of New Orleans (Albert B. Koorie, of New Orleans, of counsel), for appellees.

ST. PAUL, J.

Some time before April 16, 1928, the defendant, O. M. Gwin, who is a general contractor doing business as the O. M. Gwin Construction Company, entered into a building contract with plaintiffs by which he agreed to construct an annex to the building known as the Jung Hotel in the city of New Orleans; one of the provisions of said contract being that:

"All questions subject to arbitration under this contract shall be submitted to arbitration at the choice of either party to dispute.

"The contractor shall not cause delay of any work during the proceedings of arbitration.

"The award of the arbitrators shall be in writing and it shall not be open to objection on account of the form of the proceedings or the award, unless otherwise provided by the controlling statutes.

"In the event of such statutes providing on any matter covered by this article otherwise than as hereinbefore specified, the method of procedure throughout and the legal effect of the award shall be wholly in accordance with the said statutes, it being intended to lay down a principle of action to be followed, leaving its local application to be adapted to the legal requirements of the jurisdiction having authority over the arbitration."

Another provision of said contract is as follows:

"If the owner should fail to pay the contractor within seven days of its maturity and presentation any sum certified by the architect, or awarded by the arbitrators, then the contractor may, upon seven days written notice to the owner and architect, stop work or terminate this contract and recover from the

owner payment for the work executed and any loss sustained upon any plans or materials and reasonable profit and damages."

## I.

During the course of excavating for the foundation, a flow of quicksand was struck, which caused considerable damage and delay, and a controversy arose between the contractor and the owner as to who must bear the burden of said damages and delay; whether the flow of quicksand was merely an unexpected difficulty encountered by the contractor in the execution of his work and of which he alone bore the risk (Picard Construction Co. v. Board of Commissioners, 161 La. 1002, 109 So. 816; O'Leary v. Board of Port Commissioners, 150 La. 649, 91 So. 139; U. S. v. Gleason, 175 U. S. 588, 20 S. Ct. 228, 44 L. Ed. 284), or an occurrence which should have been foreseen and provided against by owner's architects, but was not.

## II.

Thereupon the contractor demanded an arbitration, as had been provided for in the building contract, to wit, April 16, 1928.

This was before the effective date of our present excellent law on arbitration, Act No. 262 of 1928 (August 1, 1928); and hence, even by the very terms of the building contract itself, the arbitration, and all the proceedings before the arbitrators, as well as the effect of their award, were to be governed by the former provisions of the Civil Code and Code of Practice on the subject of arbitration.

## III.

Accordingly, the arbitrators proceeded to their labors, and on August 29, 1928, gave

their award in favor of the contractor and against the owners; whereupon the owners demurred and threatened to appeal from the decision of the arbitrators.

Thereupon the contractor, in his turn, gave notice to the owners that, if the award were not paid at the end of seven days, he (the contractor) "will (would) exercise the right accorded to him under the contract, to stop work or terminate the contract" (Milner, Atty., to Danziger, Atty., September 10, 1928); meaning thereby that he would avail himself of the right accorded him by the contract, if the owner should fail to pay the contractor within seven days of its maturity and presentation any sum certified by the architect or awarded by arbitrators, "to stop work or in the alternative, to terminate the contract and sue the owner for all profit, loss, damages, etc." (Milner, Atty., to Danziger, Atty., September 7th, 1928.)

## IV.

On September 10, 1928, to wit, on the same day on which the owners received the contractor's notice that he would cease work or terminate the contract, the owners went into court and prayed for judgment "reversing, setting aside, annulling and vacating, the award of said arbitrators" on numerous technical grounds, principally on the ground that the arbitrators (a majority of them) erred in their construction of the building contract and appreciation of the respective rights of the contractor and the owners.

## V.

On September 13 (14th), 1928, the owners, in order that the contractor might not stop work or attempt to terminate the contract as he had threatened to do, paid to the con-

tractor, under protest, the amount of the award against them; to wit, the sum of $14,-616.60, which amount the contractor received, acknowledging in the receipt which he gave that said payment had been made by the owners "under protest and with full reservation of your (their) rights."

### VI

Of course the suit to reverse, set aside, annul, and vacate the award of the arbitrators, the award having been paid, is a purely futile and inane proceeding, unless it be preliminary to a suit to recover the amount of the award so paid; and the courts will not pass upon purely academic questions. Hence, at the very threshold of this suit we are met with the necessity of inquiring whether, if the award be set aside, these plaintiffs may then recover the amount which they paid under that award "because of the threat of Mr. Gwin (the contractor) to stop work, and because my (Mr. Danziger's) clients, under no condition wishing to have this threat carried out, because of the tremendous loss it would entail upon someone, deem it best to pay the amount named by the arbitrators (erroneous as their decision may be), under protest, with reservation of all the rights of the Jung (the owners') interests."

If plaintiffs, even though they paid under protest and with full reservation of all their rights, none the less cannot recover the amount paid, then any action to recover said amount must be fruitless; and this suit then raises a mere moot question, not justiciable.

### VII.

If plaintiffs can recover at all, they can only do so as having paid by mistake, or through coercion, something they did not owe. Rev. Civ. Code, art. 2302.

Article 2302 reads as follows:

"He who has paid through mistake, *believing himself a debtor*, may reclaim what he has paid." (Italics ours.)

But there is no such case here. Plaintiffs may not have owed the amount of the award, but they were laboring under no mistake as to that. They at no time *believed that they owed this amount;* on the contrary, they at all times *believed that they did not owe it*, and protested vigorously that they did not. So the payment was not made because of any *mistake* as to their owing or not owing the amount they paid. When they paid it, they did *not* believe they were debtors at all; they were, and still are, without having changed their belief in any way, most positive that they were *not* debtors and did *not* owe the amount.

Hence they are not in the position of one who "has paid through mistake, *believing himself a debtor*." And if they paid what they did not owe, it was not through any mistake in believing themselves debtors, but from some other cause; that is, through coercion.

### VIII.

Now the only claim of coercion plaintiffs make here is that they paid because of the *threat* of the contractor to stop work, and because, not wishing to have this *threat* carried out, they deemed it best in order to avoid a heavy loss to some one, either the contractor or themselves, paid the amount under protest, with reservation of all their rights.

But argues the contractor, under the terms of the contract, he had *the right* to stop work

if the award were not paid in seven days after demand for payment and notice of intention to stop work.

Hence, it is argued, the contractor threatened to do only that which he had a right to do, and that the case falls squarely within the terms of article 1856, Rev. Civ. Code, defining what constitutes want of consent arising from violence or threats; which article reads as follows:

"If the violence used be only a legal constraint, or the threats only of doing that which the party using them had a right to do, they shall not invalidate the contract. A just and legal imprisonment, or threats of any measure authorized by law and by the circumstances of the case, are of this description."

And it is argued that here the contractor was expressly authorized by the contract to do exactly what he threatened to do, and that this court has repeatedly held that one who, without error or duress, has paid an excessive demand cannot maintain an action for repetition, thereof, even though payment was made under protest. Rivers v. N. O. Water Works Co., 35 La. Ann. 822; Carey v. Commonwealth B. & L. Ass'n, 145 La. 1, 81 So. 734; New Orleans & N. E. R. Co. v. Louisiana Const. & Imp. Co., 109 La. 13, 33 So. 51, 94 Am. St. Rep. 395, and authorities there cited.

### IX.

But since the contract provided clearly that the arbitration should be had according to the laws of this state (i. e., under the provisions of the Civil Code) which then allowed an appeal to the courts from the decision of arbitration, the clause in the contract, requiring the owner to pay any sum awarded by the arbitrators within 7 days of its *maturity* and presentation, clearly contemplates either that said award should be final and not subject to appeal, or that the award should become final only by abandonment of the appeal or affirmance thereof on appeal. For it is clear the award could not *mature* until it became exigible, and could not become exigible until it became final; and an award by arbitrators, partaking of the nature of a judgment, cannot, if appealable, be executory or exigible.

But an award of arbitrators, not clothed with the powers of "amicable compounders," cannot be made final and not subject to appeal by convention of the parties to the submission. Rev. Civ. Code, art. 3130; Code Prac. art. 460.

Hence it follows that the award herein could not become final and exigible or executory until after an appeal to the courts had been abandoned or had resulted in an affirmance of the award; unless it be found that these arbitrators were clothed with the powers of amicable compounders.

But they are not called, eo nomine, amicable compounders in the contract, and nothing on the subject of arbitration in that contract (which we have quoted in full in the beginning of this opinion) indicates that the arbitrators were to proceed otherwise than in strict accordance with the law (see article 3110, Rev. Civ. Code); on the contrary, the very reverse of this appears to be the case, as a mere reading of the clause an arbitration (quoted above in full) will show.

### X.

It behoves us therefore to look into the award of the arbitrators. But all the objec-

tions urged by the plaintiffs against the form of the proceedings had by the arbitrators appear to us as being unfounded or having been waived; and accordingly we will consider only the merits of their award.

## XI.

The flow of quicksand, cause of the damages and delay which were the subject of controversy between the parties, was due to the single fact that the sheet piling, driven to provide lateral support for the soil adjacent to the excavation that was being made for the foundations, was not of sufficient length for the purpose; and the question is, Whose was the fault, if any; and, if there was no fault, then whose was the risk?

## XII.

We see no fault on either side. Both the contractor and the architects are acknowledgedly men of skill and experience in their respective callings, and neither of them expected, or had reason to expect, the unusual soil conditions which afterwards developed. Had the architects expected, or even suspected, such condition, they would undoubtedly have provided, in order to insure the safety of the work under their supervision, for a greater minimum length for the aforesaid sheet piling. And, by the same token, had the contractor expected or suspected such condition, he would not have failed to use sheet piling somewhat longer than the minimum which the contract and specifications required him to use.

We think, and the event shows, that this unusual condition of the soil was an unexpected and unforeseen occurrence, though not a *fortuitous* event within the meaning of the Code (Rev. Civ. Code, art. 3556, subds. 14, 15, and article 1933, subd. 2).

## XIII.

It is the general rule that the risk of all such unforeseen, though preventable, occurrences fall on the contractor, unless the contrary be clearly agreed upon. O'Leary v. Board of Port Commissioners, 150 La. 649, 91 So. 139; Picard Construction Co. v. Board of Commissioners, 161 La. 1002, 109 So. 816, and authorities there cited.

And in this contract it was not so agreed. On the contrary, the contract very definitely provides, especially in the matter of sheet piling, that the contractor shall beware such conditions. Thus the contract provides: "The General Contractor shall, throughout this entire operation and more especially during the progress of pile driving work and excavating, use extreme care and shall employ every usual and *necessary* precaution to protect adjoining hotel and other proximate buildings from damage, and the occupants thereof from annoyance." (Italics ours.) And again: "Piling subcontractor shall furnish and drive sheet-piling of sufficient cross sectional dimension and length to afford the resistance necessary to protect all excavations for piers, trenches, tanks, and cellars and elevator-pits, assuming full responsibility for the accomplishment of this. He shall provide such other sheet-piling as may be necessary to insure the safety and integrity of adjoining structures and to prevent injury to city curbs and streets, sewers, drains, and other sub-soil facilities set forth above under caption: 'Conditions at Sight,' and shall assume full responsibility for the size and sufficiency of the same to the end

employed. He shall cut off sheet-piling when, and to such depths as may be directed by the Architects."

And the fact that the specifications provided that "all sheet piling shall be driven to a point not less than ten feet below levels of adjoining maximum excavations," evidences, not that the contractor was not required to drive the sheet piling more than ten feet below the deepest excavation, even though it proved necessary to go deeper, but that he was required to go *at least* ten feet below the level of adjoining maximum excavations, *whether necessary or not.*

## XIV.

The trial judge rendered judgment in favor of plaintiffs and against the defendant "reversing, setting aside, annulling and vacating" the award of the arbitrators; and the judgment appears to us correct.

### Decree.

For the reasons assigned, the judgment appealed from is affirmed.

O'NIELL, C. J., concurs in the decree, but not in what is said in the first paragraphs of the prevailing opinion.