202 So.2d 268

**Edward H. WURST et al.**

**v.**

**Clarence S. PRUYN et al.**

No. 48425.

June 30, 1967.

Rehearing Denied Oct. 4, 1967.

Seale, Smith & Baine, Baton Rouge, for plaintiffs-appellees-relators.

Kantrow, Spaht, Weaver & Walter, Kleinpeter & George, Baton Rouge, for defendants-appellants-respondents.

SUMMERS, Justice.

Edward H. Wurst and his wife Gloria T. Wurst instituted these proceedings on May 2, 1962 for the loss they allegedly incurred, amounting to $27,445, when the dwelling house constructed for them by defendants fell into ruin. The defendants are Clarence S. Pruyn, Clarence S. Pruyn, Jr. and Thomas R. Pruyn, as individuals; Pruyn Realty Co. and Pruyn and Pruyn Construction Company, commercial partnerships; and Pruyn Realty Co., Inc. and

Pruyn and Pruyn Construction Co., Inc., domestic corporations.

According to the record, the Pruyns, before incorporating their businesses, were the developers of Forest Hill Subdivision. They had just staked out the foundation for a house and were building the forms for a concrete slab on Lot No. 11 in the subdivision when, on February 14, 1957, they entered into a contract with Mr. and Mrs. Wurst. Under their agreement the house on Lot No. 11 was to be completed in accordance with plans which the Pruyns furnished, and thereafter title was to be transferred for a total price of $16,965. On June 10, 1957, the construction having been completed, title to the lot and house was transferred.

A complaint of cracking of the concrete slab foundation and floor of the house was first made in 1958. Inspection at that time disclosed minor cracking of the slab at the northwest corner of the rear bedroom. By December 1960 the entire house had settled, resulting in extensive cracking of the floors, walls, ceilings, windows and doors. The damage to the house was substantial and is not disputed.

An FHA inspector attributed the settling of the house to "evidence of soil failure of some type." Dr. Louis Capozzoli was called as a witness by Mr. and Mrs. Wurst. He is a qualified, licensed engineer and an expert in soil mechanics, soil investigation and foundation work. His educational qualifications are impressive, and his version of the cause of the failure of the structure was accepted by both the trial court and the Court of Appeal. We have no reason to discount his opinion in any particular.

By borings and inspection, Dr. Capozzoli found the soil beneath the foundation would normally have been more than adequate to support the weight of the house, but it was rendered defective by shrinkage. He said the shrinkage occurred because the soil beneath the house was in too close proximity to several large trees.

In the rear or north side of the house, his inspection disclosed an 8-inch pecan tree, 6 feet from the house; two 8-inch oak trees, 11 feet from the slab; a 42-inch oak, 15 feet from the slab; a 12-inch oak, 16 feet from the slab; and a 48-inch oak 40 feet from the slab. On the front side was a 24-inch oak, 6 feet from the slab; a 12-inch oak, 13 feet from the slab; and two 8-inch oaks, 11 feet from the slab.

According to Dr. Capozzoli all of these trees contributed to the shrinking of the soil beneath the house by absorbing the water from the soil. As the water was depleted the soil shrank and subsided. This movement caused the house resting on it to also move, producing the cracking and failure of the structure complained of in this suit.

Dr. Capozzoli felt that some of the trees should have been cut down, but, if this were not desirable for aesthetic reasons, the builder should have dug a trench 10 feet deep and 2 feet wide surrounding the house, between the house and the trees. The trench should have been filled with gravel, and, about one foot from the top of the trench, a 4-to-6 inch perforated pipe should have been installed with a constant level float valve connected to the water supply. This installation would keep the trench constantly filled with water and serve to counteract the water absorbing action of the trees. Dr. Capozzoli would have recommended this procedure because of the number and size of the trees and their close proximity to the house.

To the petition for damages or for the loss incurred filed by the Wursts, exceptions of prescription of one year and no cause of action were filed by the Pruyns. These exceptions were based upon the theory that the relationship between the Pruyns and the Wursts was that of vendor-vendee. Accordingly, the only remedies available to the Wursts as vendees were actions for redhibition or for the reduction of the purchase price, which were prescribed in one year after the sale. These exceptions were overruled by the trial court. It found instead that the Pruyns were workmen or undertakers within the contemplation of Article 2762 of the Civil Code, and the suit was de-

creed to be timely filed as the ten year prescription of Article 2762 was applicable. Trial on the merits resulted in a finding that the house had fallen to ruin on account of the badness of workmanship. Judgment was accordingly rendered in favor of Mr. & Mrs. Wurst for $6,150, which was the cost of repairing the damage to the house.

On appeal the judgment of the trial court was reversed by the First Circuit. That court was of the opinion that the drying and shrinking of the soil beneath the house foundation was due to natural causes and not to the badness of workmanship or faulty materials. Thus, the Court concluded that no responsibility attached to the Pruyns as contractors under Article 2762 of the Civil Code. The Wurst suit was dismissed. 189 So.2d 689. We granted certiorari on the application of the Wursts to review the judgment of the Court of Appeal. 249 La. 840, 191 So.2d 641.

Article 2762 of the Civil Code, upon which the Wursts rely to sustain their cause of action, provides:

"If a building, which an architect or other workman has undertaken to make by the job, should fall to ruin either in whole or in part, on account of the badness of the workmanship, the architect or undertaker shall bear the loss if the building falls to ruin in the course of ten years, if it be a stone or brick building, and of five years if it be built in wood or with frames filled with bricks."

The Pruyns seek to sustain the Court of Appeal judgment on the grounds assigned by that court. In addition, they have renewed their contention that the relationship between the Pruyns and the Wursts was a vendor-vendee relationship, and, hence, only an action for redhibition or reduction in the purchase price was proper in this case. La.Civil Code art. 2520 et seq. and art. 2541 et seq. Further, they say, because more than one year had elapsed since the sale to the Wursts, any action for redhibition or reduction in the purchase price had prescribed. La.Civil Code art. 2534.

In most instances the question of whether the vendor-vendee relationship exists is resolved by the proof. Such is the case here. On the basis of facts which they found, both the trial court and the Court of Appeal resolved the issue against the Pruyns. Hunter Company v. Commissioners of Bossier Levee District, 115 So.2d 226 (La.App. 1959). For that reason, and because we agree with those findings, we will treat the question briefly before we go into the other issues of the case.

The Pruyns were father and sons, and through their various businesses they employed their efforts and capital as developers, realtors and contractors. In the Wurst transaction they acted both as realtors and contractors. Subsequent incorporation of one business as "Pruyn Realty Company, Inc.," and another as "Pruyn and Pruyn Construction Company, Inc." support this conclusion. And the fact that the agreement between the parties was made at the very beginning of the construction also lends weight to this view. Moreover, the agreement stipulated for certain modifications in the plans which the Wursts had requested. These were changes an owner would usually make with the contractor or builder and included such things as the substitution of a sliding door in the dining room, placement of the hot water heater in the alternate pantry, substitution of a solid door in the kitchen in place of a louvered door and placement of a floodlight in the rear of the house. One clause made a categorical reference to the Pruyns as builders when it set forth "Builder to build three air conditioners * * *" into the walls of the house. Other plan changes which would ordinarily appear in a contract between a builder and the owner were contained in the purchase agreement. The testimony, too, is to the effect that the Wursts negotiated with the Pruyns as the builders.

The Pruyns, therefore, were the contractors or undertakers within the contemplation of Article 2762 of the Civil Code; for they agreed to construct the house for a certain sum according to the selected plan. Their relationship with the Wursts was not one of vendor-vendee. Legal principles relating to redhibition and to the action for the reduction of the purchase price are in consequence inapplicable.

Chatelaine v. Globe Construction Co., 229 La. 280, 85 So.2d 515 (1956); Matthews v. Rudy, 4 La.App. 226 (1926); Comment, 7 La.Law Rev. 564 (1947).

Rather, like the trial court, we find Article 2762 of the Civil Code applicable to the facts of this case. Indeed, under our view the issue under that article has been narrowed to the question of whether the Pruyns as contractors were chargeable with "badness of workmanship" in locating the house in such close proximity to the numerous trees on the lot.

■ Although the French Codal Article (C.N. 1792), from which Article 2762 of our Civil Code was derived, provides that the undertaker is responsible for loss occasioned by "defects in the soil", this provision of the French Code was omitted from Article 2762. In keeping with the omission, Louisiana's jurisprudence has long recognized that the undertaker under Article 2762 is not responsible for "defects in the soil". Under our law, therefore, unlike the French law, to hold the undertaker liable, the owner must show that the ruin was due to badness of workmanship or defective materials. Brasher v. City of Alexandria, 215 La. 887, 41 So.2d 819 (1949); Powell v. Markham, 18 La.Ann. 581 (1866); Freemont v. Harris, 9 Rob. 23 (1844); Code Napoleon, art. 1792; Comment, 7 La.L.Rev. 564 (1947); Rogron, Les Codes Francais Expliques—Droit Civil, p.

333, art. 1792 (3rd ed. 1847); 2 Planiol, Traité Élémentaire De Droit Civil, n° 1916 (11th ed. 1939).

While undertakers and architects under Article 2762 are held harmless for "defects in the soil", it is latent defects in the soil which are meant. Hence a different result would obtain if the soil defect was apparent to the undertaker. And it could not be otherwise, unless a contractual stipulation governed the question. For the requirements of public order and the obligation implicit in every contract that the work will be done in a good and workmanlike manner would compel us to reject a contention that an undertaker is not responsible for building upon a site which he knows to be defective. In such a case, the barest standards of care would require him to bring the defect to the attention of the owner before proceeding. The owner would then have an opportunity to make the indicated adjustment in the contract to provide against the defective soil condition of which he had no prior knowledge. Matthews v. Rudy, 4 La.App. 226 (1926).

■ Not only do we think Article 2762 imposes liability upon an undertaker who builds upon a site he knows to be defective, but we are also of the opinion he is liable for the loss resulting from a structure falling into ruin when he should have known by the exercise of proper judgment that a condition at the site, other than a

latent defect in the soil, should be corrected before proceeding with the work, and he fails to advise the owner in time to permit an adjustment. This is an obligation of the undertaker which seems plain to us. Draube v. Rieth, 114 So.2d 879 (La.App. 1959). For the contractor has expert knowledge of such things, or should have, and he must bring these things to the attention of the owners, who have no knowledge of such affairs. See Jung v. Gwin, 174 La. 111, 139 So. 774 (1932).

Thus in the instant matter, where the soil was entirely adequate when the work began but failed because the structure was built too near to too many trees, we do not have the case of a soil defect such as was recognized in Freemont v. Harris, 9 Rob. 23 (1844) and Powell v. Markham, 18 La. Ann. 581 (1866) and the other cases involving latent soil defects which were held to exonerate the undertaker. Here

the soil was fine. It was the method of building, the lack of foresight in the workmanship—the failure to know what would surely happen—which caused the structure to fall to ruin. In short, it was "on account of the badness of the workmanship" that the soil was dried out by the trees and rendered unsuitable for supporting the Wurst house.

■ Nor do these facts involve a "natural cause" or "fortuitous event"—a cause over which the undertaker had no control, which might exonerate the undertaker under Articles 1933 and 3556(14) (15) of the Civil Code.[1] It is just the opposite. The ruin was brought about by the badness of workmanship in that the undertaker did not foresee what was reasonably foreseeable and preventable. See Jung v. Gwin, supra.

Although the evidence presented by the Pruyns is emphatic that they had never

---

1. Article 1933 provides:
"When the breach has been passive only, damages are due from the time that the debtor has been put in default, in the manner directed in this chapter.
"The rules contained in this and the preceding articles, however, are subject to the following exceptions and modifications:
\*　　\*　　\*　　\*　　\*
"2. Where, by a fortuitous event or irresistible force, the debtor is hindered from giving or doing what he has contracted to give or do or is from the same causes compelled to do what the contract bound him not to do, no damages can be recovered for the inexecution of the contract."

\*　　\*　　\*　　\*　　\*
Article 3556(14) & (15) provide:
"Whenever the terms of law, employed in this Code, have not been particularly defined therein, they shall be understood as follows:
\*　　\*　　\*　　\*　　\*
"14. Force.—Force means the effect of power which can not be resisted.
"*Superior force.* Those accidents are said to be caused by superior force, which human prudence can neither foresee nor prevent.
"15. Fortuitous Event.—Fortuitous event is that which happens by a cause which we can not resist."
\*　　\*　　\*　　\*　　\*

known of such a happening before, the evidence is just as emphatic and at the same time more impressive to the contrary. It preponderates to the effect that the failure to remove some of the trees or to build the protective trench would undoubtedly bring about the ruin which did in fact occur. Dr. Capozzoli's testimony informs us that the use of the protective trench was a practice which was becoming more common in the vicinity of Baton Rouge where this construction took place. This being the state of the record, we conclude that, if the undertaker did not know of the danger to the structure by reason of its being in such close proximity to so many trees, he should have known and should have brought the risk to the attention of the owners before proceeding.' Cf. Loeb v. Staples, 234 La. 642, 101 So.2d 1 (1958); Kuhlman v. Talley, 145 So.2d 101 (La.App.1962).

Much evidence was adduced on the point and the brief stresses the fact that the cost of constructing the protective trench recommended by Dr. Capozzoli is economically unfeasible in construction in this price range. If that is true, the house should have been relocated or the trees should have been cut down. At least, the Wursts should have been given the opportunity to accept or reject a plan to protect the building with the trench at their own cost. If they failed

to accept such a recommendation, the risk would then have been theirs. None of these protective steps were taken even though the building site indicated the necessity for them.

▬▬ Contrary to the findings of the Court of Appeal, we find that the Pruyns are chargeable with more knowledge of the effect of trees on the stability of the soil than the Wursts. A person who holds himself out as a builder is charged by the law with the requisite knowledge of his trade. It is an implied obligation which results from the nature of the contract. La.Civil Code art. 2026.[2] Aside from this legal presumption which operates against the Pruyns, Dr. Capozzoli testified that the trench digging practice he recommended was becoming increasingly common in the area. And, we gather from his testimony, knowledge of the effect of trees upon the stability of the foundation soil was rather common in the building trade. At least, it is inferred, this knowledge is common among the well-informed in that trade.

▬▬ From the foregoing we conclude that the ruin was "on account of the badness of the workmanship" and the Pruyns must bear the loss.

▬▬ After hearing evidence on the question of the cost of restoring the build-

---

**2.** Article 2026 provides:

"Conditions are either express or implied. They are express, when they appear in the contract; they are implied, whenever they result from the operation of law, from the nature of the contract, or from the presumed intent of the parties."

ing, the trial court awarded $300 for removal of trees around the house, $3,000 to correct the failure to the foundation and $2,850 to repair the cracks in the walls and slab. This total award of $6,150 is supported by the evidence, and we will not disturb it.

For the reasons assigned, the judgment of the Court of Appeal is reversed and set aside and the judgment of the trial court is reinstated and made the judgment of this court.

HAMITER, J., dissents, being of the opinion that the judgment of the Court of Appeal is correct.

HAMITER, J., is of the opinion that a rehearing should be granted.