**LOUIS RAIMER, Plaintiff**

**v.**

**GARFIELD STOUT, Defendant**

Civil No. 270/1977

Territorial Court of the Virgin Islands

Div. of St. Thomas and St. John

April 27, 1978

GEORGE M. MILLER, ESQ., St. Thomas, V.I., *for plaintiff*

ALPHONSO A. CHRISTIAN, ESQ., St. Thomas, V.I., *for defendant*

FEUERZEIG, *Judge*

## MEMORANDUM OPINION

This is an action for breach of a construction contract. The plaintiff-owner alleges that the defendant-builder breached his warranty to perform in a good and workmanlike manner and that shortly after completion of the structure large cracks appeared in the walls. As a result, the plaintiff seeks damages for the repair of the structure and for the loss of rental income.

## I.

### A.

Plaintiff, Louis Raimer (hereinafter referred to as Mr. Raimer, plaintiff, or owner) and defendant, Garfield Stout (hereinafter referred to as Mr. Stout, defendant, or builder) entered into a written contract on June 13, 1972, for the construction of a two-story residence on Parcel 5-E Estate St. Joseph & Rosendahl, St. Thomas. The price was $9,600, which has been paid in full by the plaintiff.

Plans for the work indicate that they were drawn by one E. McClean. There is no indication, and no testimony was adduced, as to who was responsible for the preparation of the plans, nor do the plans indicate the nature of the terrain upon which the structure was to be built. However, there are no allegations that the plans are defective. In the absence of an allegation or any evidence that they are defective, the court must and does assume that the plans were drawn mindful of the terrain upon which the structure was to sit and that the plans are not defective in that regard.

572

The testimony adduced at trial was often incomplete and confusing. Many of the essential facts, however, are not in dispute. To appreciate the facts that will be developed herein, it is necessary to keep in mind the following pertinent contract provisions. On page one the following appears:

NOTE: All footings to rest on undisturbed soil.

On page two there is a general warranty clause:

The Contractor guarantees that any materials supplied and that the quality of the labor performed by him will comply with local building codes, laws, rules, and/or regulations and further agrees that the materials to be furnished by him will be sufficient to complete the work designated herein, and that all labor and services shall be completed in a good workmanlike manner.

Finally, on page three there is the following provision:

The Contractor agrees that there shall be no charge whatsoever for any extra work performed and/or materials supplied him/it, unless such extra work and/or materials supplied is specifically ordered in writing by the Owner.

Also of significance, and of equal importance, is Title 29 V.I.C. § 303(a), which provides in pertinent part:

Foundation walls or other permanent supports shall rest on solid ground or on piles when solid earth or rock is not found.

Further, under 29 V.I.R.&R. § 312(b-6):

Every building and structure shall be of sufficient strength to support the imposed live, dead and wind loads, the lateral forces caused by earthquakes, and the impact loads, if any, without exceeding in any of its structural elements the stresses prescribed in this Code.

Clearly the contract and Virgin Islands law required the home to be built on solid ground or undisturbed soil. The defendant conceded this and admitted that excavation

and other work preliminary to and including construction of a solid foundation were his sole responsibility. He was to test the soil for firmness, dig a trench for the foundation, perform the actual excavation, and pay the cost. This he did. Neither by statute, nor by contract, nor by direction of Mr. Raimer was the builder told how deep to dig the trench or how much land to excavate to find solid soil. This was left to the builder's sole discretion, it being within the realm of his exclusive expertise.

The defendant testified that he began construction of the foundation on soil he characterized as "medium," that is, soil that was neither "hard" nor "soft." He further said that in some areas of the property the soil was harder than in others, and that because of this variation in soil condition he had to dig to a depth of 16 inches in certain areas and 24 inches in others. He explained that the difference in strength at different points of the foundation was the result of differences in the soil and that the soil's strength varies according to the slope of the land. The defendant maintained, however, that the soil was firm before he started pouring concrete. In his opinion the present defective condition is caused by the undermining of the foundation due to the constant moisture of the ground brought about by rainfall. He said that one day, while the house was under construction but two or three months before its completion, it began to rain and that the water came "pouring down and it went right into the foundation that was cut and it started to circle backward around the house." Later inspection revealed that a culvert above the property that cut across the main road caused the water to be thrown onto the plaintiff's property. Mr. Stout testified that he had informed Mr. Raimer of this condition later that same afternoon and told him that he would have to build a retaining wall or there would be future unspecified

"detriment" to the building.[1] On approximately three additional occasions, according to the defendant, he repeated this advice to the plaintiff that he, Mr. Raimer, should build some kind of protection for the structure because water could undermine the building. Several of the defendant's workmen testified to being present at each of these conversations during which the defendant said in effect that it "would be wise" to erect a retaining wall. At no time, however, did Mr. Stout take any corrective action, nor did he insist that Mr. Raimer remedy the situation before proceeding with construction. Instead, Mr. Stout went ahead and completed the house. At trial Mr. Stout said that if the wall had been built the plaintiff's chances of avoiding trouble "definitely" would have been improved.

At the pretrial conference it was stipulated that construction was completed on January 19, 1974. At trial the plaintiff testified that it was completed "near the end of 1973," while the defendant testified it was in the middle of 1973. Although not of critical importance, the court credits the testimony of the plaintiff and finds as a fact that the structure was completed near the end of 1973. In any event, before the defendant's departure from the site, the plaintiff noticed that the ceiling had developed ridges and questioned Mr. Stout about this. According to the plaintiff, Mr. Stout reassured him by explaining that it was "the plywood." Months later it was brought to Mr. Raimer's attention that the floor had developed ridges and bumps all over it as well. Sometime during 1974, cracks began to appear in the walls of the structure, some of which grew to half an inch or an inch in size, large enough to see through and for rodents to crawl in and out.

---

[1] Although it was never made completely clear, it is implicit from the testimony that the construction of the retaining wall would have been at additional expense to the plaintiff.

It should be added that at the request of the parties the court personally inspected the building and the premises. Observation disclosed that the property is located on steep terrain several hundred feet north of the road leading to Magens Bay. Inspection also confirmed that heavy rain would produce considerable runoff. This was supported by the fact that the cracks complained of appeared only on the east and northeast sides of the building. Conversely, there were no cracks or other visible defects on the west and south sides of the building.

## B.

The plaintiff testified that he intended to rent the downstairs apartment for $150 to $200 a month but was unable to do so because of the uninhabitable condition that developed. A teacher looked at the apartment sometime in mid-1974 and expressed an interest in it, but she refused to rent the apartment because of the cracks. Mr. Raimer did not advertise the apartment because, in his words, "after I had seen the condition. I won't [sic] put my dog in there to stay." In addition, plaintiff's expert witness, Deanne Hubbard, a licensed real estate saleswoman, testified that the fair market value of the apartment in its present condition is zero. In the absence of the cracks, she said, it would rent for $195 to $225 per month.

## C.

With respect to the needed repairs, the plaintiff testified that he spent $830 to have Joseph Rey come in and "smooth" the floor and lay tiles. This was corroborated in part by Mr. Rey, who claimed he received $850 from Mr. Raimer to level the floor, tile, and paint. Of this amount Mr. Rey estimated that $300 was solely for levelling the floor or repairing the alleged defects caused by the de-

fendant's work. Mr. Raimer said he was unable, however, to repair the cracks in the walls because he could not afford it. He testified that he is retired,[2] collects social security, and has $100 per month rental income from a small house. His monthly mortgage payments were $409.90 and his total indebtedness was $38,000. In 1976 he said Mr. Rey gave him an estimate of $5,000 to repair the cracked walls. Two years earlier, however, in mid-1974, Mr. Rey gave an estimate of $3,500. His estimate now stands at between $6,000 and $7,000. At no time, however, did the plaintiff attempt to secure a loan or otherwise repair the premises.

## II.

Given the contractor's actual knowledge of the effect of rainfall on the structure's foundation, the issue is what, if any, duty did he have to ensure the integrity of his work including, but not limited to, the obligation to build a retaining wall. The defendant having virtually conceded that the defective condition of the structure was a result of ordinary rainfall, the question is not one of proximate cause, but primarily the extent of the builder's duty to the owner. A subsidiary issue is the extent to which the plaintiff is estopped from complaining of the defendant's performance in light of Mr. Stout's warning before completion of the building. If liability is found, there is the further issue of damages.

### A.

It cannot be disputed that construction of a solid foundation, resting on firm ground and sufficient to support the intended house, was an obligation assumed by the

---

[2] There is no indication as to when Mr. Raimer retired. It is clear, however, that as late as 1973, when the house was constructed, he still was working.

builder under the specific and general warranty clauses of the contract as well as by force of law. Title 29 V.I.C. § 303(a) and 29 V.I.R.&R. § 312(b-6).[3] Plaintiff thus seized on the defendant's admission that the house was constructed on "medium" soil as opposed to "hard" soil. He argued, therefore, that it was not constructed on "undisturbed soil" or on "solid" ground.[4] The court, however, cannot predicate the builder's liability on this fact alone because no testimony was adduced equating "hard" soil to "undisturbed" soil or "solid" ground. Nor will the court make the necessary mental leap to do so. For all that this court knows the terms may mean different things within the industry, and the construction of a foundation on medium soil may be well within the parameters laid down by the contract and the statute. Accordingly, the defendant's admission cannot be the sole basis for the imposition of liability or for the court to conclude that the soil was not undisturbed.

■ The defendant's liability is unequivocally established, however, by his admission that he knew several months prior to the structure's completion that ordinary rainfall and the runoff it produced would destroy the building's foundation.

■ The defendant had expressly obligated himself to build a structure of which the footings were to rest on undisturbed soil. By virtue of the general warranty clause he guaranteed that this nexus of labor and services would be rendered in a good workmanlike manner. Moreover, the defendant held himself out to the public in general, and the plaintiff in particular, as a builder or building contractor who was especially qualified to construct homes. As to him

---

[3] See text page 573, supra.
[4] See text page 574, supra.

[i]t is well settled that in building or construction contracts whenever someone holds himself out to be specially qualified to do a particular type of work, there is an implied warranty that the work will be done in a workmanlike manner, and that the resulting building, product, etc. will be reasonably fit for its intended use. Thus, there was also an implied warranty to perform the contract in a workmanlike manner which was virtually coextensive with the express warranty cited above.

Lewis v. Anchorage Asphalt Paving Co., 535 P.2d 1188, 1196 (Alas. 1975). Stated otherwise,

A person who holds himself out as a builder is charged by the law with the requisite knowledge of his trade. It is an implied obligation which results from the nature of the contract.

Wurst v. Pruyn, 250 La. 1109, 202 So.2d 268, 273 (1967). Finally, under 29 V.I.C. § 303(a) and 29 V.I.R.&R. § 312 (b-6) the builder was enjoined to construct the foundation on solid ground. It was of no concern to the plaintiff *how* the defendant accomplished this. As noted, proper construction was the builder's responsibility under the law and the contract and was within his area of expertise. Indeed, the defendant concedes this when he allows that if he built on unfirm ground "his liability would follow."[5] However, by his own admission, Mr. Stout deliberately proceeded to construct the building with full knowledge that ordinary rainfall would undermine its foundation. This is a failure to perform in a good workmanlike manner.

■ The defendant protests, however, contending that Mr. Stout built exactly what he (Mr. Raimer) asked for, in exactly the place where he directed that it be erected.[6]

This, however, did not relieve Mr. Stout of his duty under the contract and 29 V.I.C. § 303. Even though he was told

---

[5] Defendant's reply brief at 1.

[6] Defendant's post-trial brief at 3.

to follow fixed plans and specifications, he had a duty to examine them and to make sure that a proper foundation could be constructed that would not be undermined by ordinary rainfall. A proper foundation is one built on stable ground that will withstand the effects of ordinary rainfall and is a fundamental requirement of any house. As the Supreme Court of New Mexico stated:

That this foundation may have been adequate under normal conditions in the ordinary course of building, avails appellant nothing. A foundation which will not withstand moisture but which shifts as a result thereof causing damage to the structure upon it, is insufficient.

Jackson v. Goad, 73 N.M. 19, 385 P.2d 279, 281 (1963).

■■ Consequently, the failure of Mr. Stout to build a foundation that would withstand ordinary rainfall was a failure to build in a workmanlike manner and a breach of both the express and implied warranties of the contract. Further, the court must conclude that the foundation was not built on undisturbed soil within the meaning of the contract.[7] The resulting structure, the walls of which began to crack within months of its completion, was no less a breach of contract than if the defendant had failed to build the house at all.

As a matter of law, it is a substantial failure if the foundation of a house cracks so as to leak, and crumble, immediately after its completion; whereas, if it had been properly constructed it would have done neither.

Newcomb v. Schaeffler, 131 Colo. 56, 279 P.2d 409, 411 (1955), quoting Nance v. Patterson Bldg. Co., 140 Ky. 564, 131 S.W. 484, 485 (1910); accord Nelson v. Hazal, 89 Idaho 480, 406 P.2d 138 (1965) ("The mere fact that a shell was constructed containing the rooms outlined in

---

[7] The court also finds that the foundation was not built on solid ground within the meaning of 29 V.I.C. § 303(a).

the contract, does not in itself mean that the contract was substantially performed." 406 P.2d at 144.)

## B.

■ Defendant, however, seeks to obfuscate the issues by directing the court's attention to the retaining wall. His position is that the contract called for the construction of a home, which he maintains he built, and that he was under no further contractual obligation to erect a retaining wall.[8] He further maintains that his advice to the plaintiff concerning the wall should be characterized as a "commendable," "gratuitous," and "magnanimous" gesture on his part but one that he was under no duty to make.[9] This misses the point. To reiterate, the defendant was obligated to build a solid foundation by whatever means necessary. If, in order to accomplish this, Stout had to destroy the partially completed foundation and redig the trenches and begin the entire project anew, and this was the only way to ensure the integrity of the structure and make good on the specific and general warranty provisions of the contract, then this is what the defendant was obligated to do. If, however, the erection of a retaining wall would have proven equally efficacious in preserving the integrity of the structure and ensuring the security of the foundation from runoff, and this alternative was easier, less time consuming or less expensive, then it was within the builder's professional discretion to build it. By whatever the means, the contractor obligated himself to build a

---

[8] Defendant's post-trial brief at 3. The plaintiff joined issue on this and asserted that the contractual provision that provides "there shall be no charge whatsoever for any extra work performed" unless ordered by the owner imposed a duty on the contractor to build the wall at no additional charge. Plaintiff's post-trial brief at 9. The provision, however, is vague on its face and the court finds no need to express an opinion as to the extent of the contractor's liability under it in light of the decision it reaches.

[9] Defendant's post-trial brief at 2–3.

house with a solid foundation. The fact that the defendant did not realize that performance would be more expensive and time-consuming than he originally had forecast until after he signed the contract and began excavation is legally non-cognizable.

■ Unanticipated difficulty or expense, even though considerable, does not prevent a contractual duty from arising nor does it discharge a duty that has already arisen. Section 467 of the Restatement of Contracts (1932)[10] provides:

Except to the extent required by the rules stated in §§ 455–466,[11] facts existing when a bargain is made or occurring thereafter making performance of a promise more difficult or expensive than the parties anticipate, do not prevent a duty from arising or discharge a duty that has arisen.

Attention is drawn to Illustrations 1 and 2 of Comment b to § 467, supra, which are similar in material respects to the facts here.[12] Illustration 1 lays down the rule that a contractor who is obligated to build a structure must do so even though he encounters unexpected expense in laying the foundation; and further, although he has laid the foundation and partially erected the building, should the building and foundation be destroyed by an earthquake, his duty to perform under the contract remains. Illustration 2 stands for the proposition that a contractor's duty to erect a structure by a specified date is not discharged by un-

---

[10] Title 1 V.I.C. § 4 provides that in the absence of local law to the contrary the rules of the common law as expressed in the Restatement shall be the rules of decision in Virgin Islands' courts.

[11] Sections 455–466 deal with impossibility of performance and are not relevant here.

[12] In The Boathouse v. Waggoner, Civil No. 373/1973 (D.V.I. 1976) Judge Christian held that

[a]lthough the comments submitted by the draftsmen of the Restatement in connection with the various sections thereof are not to be regarded as having the force of law, such comments constitute valid interpretive tools for a court's guidance . . . [and] may be of substantial value in determining the import of . . . [a] section.

Memorandum opinion at 1–2.

582

usually heavy rains that make it impossible for him to complete the building on time by the usual methods. This is because "[v]agaries of the weather should be anticipated." Id.

Here, it was Mr. Stout's obligation to test the soil to determine its supportive strength at various depths. The effect of ordinary rainfall on the soil also should have been considered. In addition, he should have considered the effect of runoff on the structure's foundation, keeping in mind the culvert above the property. His failure to consider or to calculate the combined effect of rainfall and runoff on the structure's foundation until after work on the foundation had begun in no way lessened his duty to the plaintiff to build a secure foundation. This is the risk Mr. Stout assumed.

If a party, for sufficient consideration, agrees to erect and complete a building upon a particular spot, and find all the materials and do all the labor, he must erect and complete it, because he has agreed so to do. No matter what the expense, he must provide such a substruction as will sustain the building upon the spot until it is complete and delivered to the owner. If he agrees to erect a house upon a spot where it cannot be done without driving piles, he must drive them, because he has agreed to do everything necessary to erect and complete the building. If the difficulties are apparent on the surface, he must overcome them. If they are not, but become apparent by excavation, or the sinking of the building, the rule is the same. He must overcome them, and erect the building, simply because he has agreed to do so—to do everything necessary for that purpose.

Newcomb v. Schaeffler, supra, 279 P.2d at 411, quoting Superintendent and Trustees of Public Schools of City of Trenton v. Bennett, 27 N.J.L. 513, 72 Am. Dec. 373.

The United States Supreme Court has held similarly. Day v. United States, 245 U.S. 159, 38 S.Ct. 57, 62 L.Ed. 219 (1917). In that case the contractor had agreed to furnish "such labor and material" "as may be necessary to

complete" a canal and locks at the cascades of the Columbia River. The government had built a bulkhead to protect the work from flooding during construction, but had not guaranteed that it would be of sufficient height. During construction there was an extraordinary flood and the contractor was forced to add six feet to the height of the bulkhead and build temporary dams to protect the work he had already done under the contract. He subsequently instituted action to recover for the extra labor and materials supplied. The High Court ruled:

> One who makes a contract never can be absolutely certain that he will be able to perform it when the time comes, and the very essence of it is that he takes the risk within the limits of his undertaking. The modern cases may have abated somewhat the absoluteness of the older ones in determining the scope of the undertaking by the literal meaning of the words alone. . . . But when the scope of the undertaking is fixed, that is merely another way of saying that the contractor takes the risk of the obstacles to that extent.
>
> It follows . . . that if the claimants put up temporary defences against the water, even though not bound to do so by the contract, they were doing what it was for their own interest and safety to do, and that in the absence of an actual contract to pay for it by the other party there is no ground for shifting the cost on to the United States.

Day v. United States, supra, 245 U.S. at 162, 38 S.Ct. at 58, 62 L.Ed. at 221. The analogy with the present case is clear. The defendant by contract undertook the risk of laying a secure foundation without qualification. Had he built the retaining wall as soon as he realized it was needed he would have done so because it was in his own interest to protect the building. He could not, thereafter, shift the cost of its erection to the plaintiff. To allow this would violate the contract and be contrary to settled law.

## C.

■ Defendant advances one final argument. He contends, in effect, that the plaintiff is estopped from recovering damages due to his failure to build the retaining wall or otherwise protect the structure because the defendant put him on notice of the seriousness of the situation. This is a persuasive argument, but it presupposes a critical fact not borne out by the evidence. Although the defendant made it clear that he did not believe he was obligated to build the wall and therefore was not going to do so, he failed to apprise Mr. Raimer of the urgency and need of its immediate erection. Nor did he advise Mr. Raimer that in the absence of such a wall the foundation would soon begin to crumble and the walls crack, rendering a portion of the premises completely uninhabitable. Further, Mr. Stout failed to show that he continued construction of the home in reliance on Mr. Raimer's assurances that the wall would be erected either contemporaneous with or after construction of the home.

■ It is perhaps apparent, with the benefit of hindsight, that the builder sought to advise the owner of the need for a retaining wall. What is not clear, however, and what the defendant failed to do was to impress upon Mr. Raimer the immediacy of the need for its erection. It was incumbent upon Mr. Stout to explain to Mr. Raimer that even ordinary rainfall would undermine the foundation of the structure and that within a few months after the anticipated completion date the walls would begin to crack and floors and ceilings begin to ridge. The builder owed a duty to the owner to make it perfectly clear that continuing construction was an exercise in futility, and that the failure to erect the wall would soon prove to be self-defeating in that the lower story would become uninhabitable within months of its completion. See Rippy v. Phipps, 475 P.2d

646 (Colo. Ct. App. 1970). Even where the defect is one of design and the defect is attributable to the architect's drawings,[13] the contractor still owes a duty of notice where the defects are apparent or discoverable.

It has been repeatedly held that, even though he be bound to follow fixed plans and specifications, the contractor owes the duty to examine such plans and judge of their sufficiency; that he is bound to discover defects that are reasonably discoverable or patent; and where he knows or had reason to believe that the plans are defective, and follows them without pointing out such defects to the owner or architect, he is not entitled to recover if the building proves insufficient because of such defects. [Rubin v. Coles, 142 Misc. 139, 253 N.Y.S. 808, 811 (City Ct. New York 1931).]

Thus, the contractor is required to bring his expertise into play and to notify even an architect (expert) of reasonably discoverable defects.

Lewis v. Anchorage Asphalt Paving Co., supra, 535 P.2d at 1199; accord Banducci v. Hickey, 143 C.A.2d 224, 209 P.2d 398, 401 (1949); see Annot. 73 A.L.R.3d 1213 (1976).

The court finds that the defendant did not discharge his duty to the plaintiff by putting him on *reasonable* notice that without a retaining wall ordinary rainfall would destroy the structure he was building. Cf. Wurst v. Pruyn, supra. Mr. Lettsome testified that the defendant had said "it would be wise" to erect a retaining wall to keep the water from coming onto the premises. At first, Lawrence Frett testified that the defendant said to "protect" the property it would "call for" a retaining wall. Later he testified that Mr. Stout had said it would be "wise" to put a retaining wall to hold the water from destroying the property. Mr. Stout himself testified that he told the plain-

---

[13] It should be remembered that absolutely no evidence was offered to show that the drawings were defective. See text page 572, supra.

tiff to build a retaining wall "otherwise there will be detriment in the future in the building." The testimony is thus largely consistent. Regardless of the words used,[14] the court finds that the message that Mr. Stout intended to convey, and, in fact, did convey to Mr. Raimer, was that the erection of a retaining wall would be "wise," advisable, perhaps even strongly advisable, for the protection of the property. The court gleans no sense of urgency or immediacy from the statements made by the builder. No reasonable construction of the statements made would have led a reasonable man to believe that from that time forward the project was doomed unless the wall was erected, and that the money, time, and materials expended during the course of the next three months were wasted effort. Moreover, this court finds that Mr. Raimer did not understand the situation to be so. In fact, at no time did Mr. Raimer give Mr. Stout any reason to believe he was aware of the gravity of the situation or that Mr. Stout had brought home the seriousness of the situation to Mr. Raimer. Thus, the notice given was not sufficient to exonerate the defendant from liability.

The defendant nonetheless continued to build. As a result, the court finds that the defendant, by his own admissions at trial, was or should have been aware that he was constructing a house with a foundation that was being continually weakened by every rainfall. His actions were thus doubly culpable, not only because he failed initially to assume the responsibility for securing the foundation for the structure, but because he continued to build, without erecting the wall himself or receiving assurances from the owner that the wall would be erected. This consti-

---

[14] The court makes no findings as to the exact words used because at trial neither the defendant nor his witnesses purported to quote the exact words spoken by Mr. Stout.

tuted waste and was a violation of the public policy of the Virgin Islands as enunciated in 29 V.I.C. § 292(a):

The purpose of this chapter[15] is to safeguard life and limb, *property*, and public welfare, through the establishment of minimum building requirements for structural strength and stability. (Emphasis added.)[16]

Moreover, in establishing minimum building requirements for the Virgin Islands, the Legislature has declared

it is not the intent of this chapter to limit building to the types of construction design materials and methods specifically covered herein. It is intended, basically, to assure that accepted engineering practice is employed in the execution of design . . . and that good construction practices are followed.

29 V.I.C. § 292(c). The court already has found that good construction practices were violated when the defendant failed to secure the structure's foundation. The defendant's further actions in completing the house jeopardized the "property" of the homeowner within the meaning of the statute and resulted in construction of a house with a downstairs apartment that is uninhabitable and unrentable. This is contrary to common sense and, as noted above, in violation of public policy.

Defendant's duty, upon realizing that the foundation was endangered by rainfall, was to warn the owner in no uncertain terms that he did not believe that his duty extended to the erection of a retaining wall and that therefore it was incumbent upon the owner to take appropriate action for the protection of the foundation. If Mr. Raimer had been properly warned, the parties could have negotiated and settled the matter at that time. Mr. Raimer

---

[15] Chapter 5, entitled "Building Code", encompasses §§ 291 to 312 and includes, incidentally, § 303 relating to foundation standards, discussed supra.

[16] Cf. Restatement of Contracts § 346(1)(a)(i) and Comment b with respect to the measure of damages where completion of the structure would entail economic waste.

either could have agreed to bear the increased costs or knowingly waived protective action by the defendant. If the plaintiff, however, after proper notice had insisted that it was the defendant's obligation to build the wall or take other appropriate corrective action at his own expense, it then would have been incumbent upon Mr. Stout either to comply or halt all work. Cf. Lewis v. Anchorage Asphalt Co., supra, 545 P.2d at 1200. Under such circumstances the matter could have been resolved by the plaintiff bringing an action for breach of contract or the defendant might have sued under the Virgin Islands Declaratory Judgment Act, 5 V.I.C. § 1261 et seq. The matter then would have been settled years ago and without the waste of money and materials that unfortunately came to pass.

## III.

 Having decided the question of liability, the court turns to the issue of damages. Plaintiff in his complaint prays for $13,600—$6,600 for the loss of rental income and $7,000 to repair the defects caused by defendant's breach. Plaintiff also prays for such other and further relief as is equitable and just. The court is guided by the Restatement of Contracts, Section 329, which states the general rule with respect to compensatory damages for substantial injury.

Where a right of action for breach exists, compensatory damages will be given for the net amount of the losses caused and gains prevented by the defendant's breach, in excess of savings made possible. . . .

As indicated by Comment a to § 329, the aim is "to put the injured party in as good a position as that in which he would have been" had the other party performed fully. This is to be done at the least cost to the defendant and without charging him with unforeseeable harms or those

that reasonably could have been avoided. See Restatement of Contracts § 336. Often it is impracticable to achieve this goal with even near certitude. Therefore, the application of the rules with respect to damages frequently entails a liberal dose of judicial discretion. See Comment a to § 329, supra. The plaintiff must, however, establish his losses with some degree of reasonable certainty to be entitled to recovery. Restatement of Contracts § 331. Loss of profits, no less than other losses, are fully recoverable if proximately caused by defendant's breach and reasonably capable of estimation. Id. Comments b–d.

 As indicated, plaintiff seeks $7,000 to repair the cracks in the walls of the house. The defendant does not dispute the plaintiff's estimate of the present cost of repair, and ordinarily this would be the appropriate measure of damages pursuant to §§ 329 and 346 of the Restatement of Contracts.[17] Accord, Hafter v. Horn, 95 Idaho 621, 515 P.2d 1013 (1973). The defendant insists, however, that the plaintiff was under a duty to mitigate his losses and relies on § 336 of the Restatement of Contracts.

---

[17] § 346 DAMAGES FOR BREACH OF A CONSTRUCTION CONTRACT

(1) For a breach by one who has contracted to construct a specified product, the other party can get judgment for compensatory damages for all unavoidable harm that the builder had reason to foresee when the contract was made, less such part of the contract price as has not been paid and is not still payable, determined as follows:

(a) For defective or unfinished construction he can get judgment for either

(i) the reasonable cost of construction and completion in accordance with the contract, if this is possible and does not involve unreasonable economic waste; or

(ii) the difference between the value that the product contracted for would have had and the value of the performance that has been received by the plaintiff, if construction and completion, in accordance with the contract would involve unreasonable economic waste.

(b) For any delay in completion fairly chargeable to the builder, the plaintiff can get judgment for the value of the use of the product, if it was being constructed for use, and for the decline in sale value, if it was being constructed for sale, in either case determined in accordance with the rules stated in § 331.

590

The court agrees.[18] The house was completed near the end of 1973. In mid-1974 the plaintiff received the $3,500 estimate from Joseph Rey. This estimate rose $1,500 within two years, and another $1,000 to $2,000 a year later. Regardless of whether the plaintiff knew or should have known of the dramatic rise in the cost of labor or materials he was under a duty to avoid further harm by all reasonable efforts. Comment a to § 336 reads in pertinent part:

After the plaintiff has reason to know that a breach has occurred . . . under circumstances such that it is not reasonable for him to expect the defendant to prevent harm, he is expected to take such steps to avoid harm as a prudent person would take. He cannot get damages for harm that could thus be avoided.

Further, § 346(1) grants recovery against a contractor only for "all unavoidable harm." This is in accord with public policy, and the policy of the courts, which is to promote the mitigation of damages. Geddes & Smith, Inc. v. Saint Paul Mercury Indemnity Co., 47 Cal. Rptr. 564, 407 P.2d 868, 870 (1965); cf. Germain v. Crown, 9 V.I. 501, 506 (D.V.I. 1973).

The plaintiff testified that, by way of mitigation, he paid more than $800 to Mr. Rey to repair the ridges that had developed on the floors. Of this amount, Mr. Rey testified that only $300 was for the purpose of repairing the defect caused by the work of Mr. Stout. The plaintiff further testified that he failed to have the walls repaired because he was financially unable to do so. He admitted, however, that at no time did he investigate the possibility of obtaining a loan.

---

[18] The court notes the disapproval of the American Law Institute on the use of the word "duty." Restatement of Contracts, § 336, Comment d. Technically, the defendant is under no legal obligation to mitigate his losses. If the injured party, however, fails to make a reasonable effort to mitigate with the result that his loss is increased, he cannot get judgment for the avoidable increase. It is in this sense that the word "duty" is used throughout the remainder of the opinion.

In his brief plaintiff contends that he was under no duty to do so because it would have entailed unreasonable expense within the meaning of § 336. The court is not persuaded, and plaintiff offered no evidence to show that a loan, in fact, would have entailed such unreasonable expense. In addition, plaintiff intended to rent the downstairs unit for $150 to $200 per month. Its fair rental value, according to plaintiff's own expert, was even higher, ranging from $195–225 per month. Assuming that plaintiff had rented the apartment for $150, the lowest of the figures mentioned, in two years' time he would have received $3,600 as rental income, or more than enough to compensate him for the cost of repairing the structure if he had done so by mid-1974. The court finds that the plaintiff's inaction in this matter was unreasonable and is not fairly chargeable to the defendant. Accordingly, for the cost of repairing the structure, the court will award the plaintiff $3,800, $3,500 of which represents the mid-1974 estimate for repairing the walls[19] and $300 of which is to reimburse Mr. Raimer for the actual expenditures made in repairing the floors.

Finally, with respect to plaintiff's claim for loss of rental income,[20] the court will award Mr. Raimer $900, for four months rent at the highest estimate of $225. Although no evidence was introduced to show how long it would have taken to repair the walls of the structure, the court believes that four months time would have been more than sufficient. This is approximately how long it took to build the entire house, and there was no indication that the structure would have had to have been demolished and the project begun anew to have made the necessary repairs in 1974. In fact, Mr. Rey indicated that he would have

---

[19] The walls did not start noticeably to crack until mid-1974.

[20] The fair rental value of the premises is an appropriate element of damages. See § 346(1)(b), supra, note 17, and Comment c, Illustration 6.

knocked out the defective walls and placed supports for the upstairs of the house while new walls were built. The court believes that four months allowance is ample,[21] but if it were not, it was plaintiff's obligation to show otherwise. This he did not do, and judgment will enter in accordance with the views expressed herein.

---

[21] Cf. Jackson v. Goad, 73 N.M. 19, 385 P.2d 279, 281–82 (1963).