566 So.2d 114 (1990)
Rose Troxclair, Wife of/and George H. TROYER, II
v.
WEBSTER HOMES, INC., et al.
No. 90-CA-159.
Court of Appeal of Louisiana, Fifth Circuit.
June 25, 1990.
Rehearing Denied September 25, 1990.
*115 Porteous, Hainkel, Johnson & Sarpy, David J. Mitchell, Dan Richard Dorsey, New Orleans, for Dixie Bldg. Material Co., Inc., and U.S. Fidelity & Guar. Co., defendants-appellants/ appellees.
Taormina & Richard, Clark A. Richard, Metairie, for Rose Troxclair, wife of/and George H. Troyer, II, plaintiffs-appellees/appellants.
McGlinchey, Stafford Cellini & Lang, Lisa Miley Geary, New Orleans, for the City of Kenner, defendant-appellee.
Before CHEHARDY, C.J., and KLIEBERT and GAUDIN, JJ.
CHEHARDY, Chief Judge.
This lawsuit arises out of the plaintiffs' claims for damages resulting from construction defects in the foundation slab of their home, located in Kenner, Louisiana. Rose Troxclair Troyer and George H. Troyer II sued their general contractor (Webster Homes, Inc.), its principals (Edward Schaefer and Ernest LaBorde), the concrete supplier (Dixie Building Material Company, Inc.), its insurer (United States Fidelity & Guaranty Company), and the City of Kenner, asserting various claims for breach of contract, redhibition, and negligence regarding the design and construction of their home. Also made defendants were other parties not before us on this appeal.
The claims against the City of Kenner were tried to a judge, while the claims against the other defendants were tried to a jury, in a five-day trial.
The jury found that Webster Homes, Schaefer, LaBorde, and Dixie all were negligent, apportioning fault 10% to Webster, 40% to Schaefer, 40% to LaBorde, and 10% to Dixie. The jury awarded the plaintiffs damages in the amount of $120,000 for property loss and expenses, with an additional $15,000 to each for mental anguish and distress, for a total of $150,000. Judgment *116 pursuant to the jury verdict was rendered on August 21, 1989.
The judge, on the other hand, dismissed the demands against Kenner for insufficient evidence. Judgment was rendered on the demands against the City of Kenner on September 1, 1989.
The plaintiffs filed a motion for partial new trial as to the liability of Kenner, which was denied. Dixie and United States Fidelity & Guaranty Company (hereafter USF & G), filed a motion for judgment notwithstanding the verdict and alternatively for new trial, which was denied, as was a similar motion by LaBorde and Schaefer.
Dixie and USF & G took a suspensive appeal; LaBorde and Schaefer took a devolutive appeal. The plaintiffs answered their appeals and took a devolutive appeal of the judgment dismissing Kenner.
On appeal, Dixie and USF & G assert that the jury was manifestly erroneous in allocating fault to Dixie, that the property damage award of $120,000 was excessive, and that the trial judge erred in refusing to grant a mistrial following testimony regarding the other defendants' inability to pay, which Dixie asserts resulted in "irreversible prejudice" to Dixie. (Dixie is liable in solido with Webster, LaBorde and Schaefer because the cause of action arose prior to the 1979 amendment of LSA-C.C. art. 2324, which limited the extent of a judgment debtor's solidary liability to the degree of his fault in comparative negligence situations. See Acts 1979, No. 431.)
The plaintiffs appeal the dismissal of Kenner and, in their answer to the appeals of Dixie/USF & G and LaBorde and Schaefer, they seek an increase in the damages awarded and award of attorney's fees.
The gravamen of plaintiffs' complaint was that the concrete foundation slab of their home, custom-built for them by Webster Homes, Inc., in 1977-78, began showing signs of failure in 1984, cracking and sinking to the extent that water began leaking through the floor of the den of the home. The plaintiffs sued Webster Homes and also sued LaBorde and Schaefer, as principals of the company, for breach of contract and negligence, claiming the design and construction of the home were deficient. They sued Dixie Building Materials for negligence and as the seller of defective concrete.
The plaintiffs' claim against Kenner was based on their allegation that Royce Waters, who was Kenner's director of public works in 1977 and was responsible for approval of the building plans, insisted the contractors redesign the plans for the foundation of the plaintiffs' home. They alleged further he insisted they use a design by him, for which the contractors paid him $50, which deleted several pilings and concrete cross-beams in the den, where the slab later failed.
In dismissing the claim against Kenner, the trial judge found that Kenner's approval of the plans and the input of Royce Waters, if any, were not the legal cause of the defects in the house. He concluded the evidence was "overwhelming" that the den slab failure arose because "construction was not in accordance with design."
The jury, in their answers to the jury interrogatories, found there was no hidden defect in the concrete supplied by Dixie, but nonetheless found Dixie negligent.
The issues before us, therefore, are whether Dixie was negligent in some way other than by supplying defective concrete and, if so, whether such negligence was a cause of the failure of the foundation; whether plaintiffs proved by a preponderance of the evidence that Royce Waters, as agent for the City of Kenner, changed the foundation plans, that such changed plans were used in constructing the foundation, and that the changes were the cause of the failure of the foundation; whether the damage award was an abuse of the jury's discretion, as either too low or too high; whether the plaintiffs are entitled to attorney's fees and/or refund of the interest on their mortgage; and whether the trial judge's admission of testimony regarding Webster Homes' inability to pay was reversible error.

*117 Liability of Dixie Building Material Company

The evidence, both lay and expert testimony, established plainly that the concrete slab was weak and did not meet the specifications. The building plans called for concrete with a minimum compression strength of 2500 pounds per square inch (p.s.i.). On tests of various samples by several different experts, the concrete in the slab had a far lower strength, with the test results varying from less than 400 p.s.i. to 2140 p.s.i. In addition, the specifications called for a slab thickness of four inches, but core samples taken by the testing experts showed it was only 3-½ inches in some places. That deficiency, however, is attributable not to Dixie but rather to the contractors.
The expert testimony established that concrete is weakened if too much water is added to the concrete mixture. Many of Dixie's dray tickets, showing delivery of the loads of concrete to the job site, bore notations indicating additional water was added at the job. The witnesses testified this is not unusual, as additional water may be necessary if the concrete mixture is too thick. However, the amounts of water marked as added were extreme, some tickets showing as much as 90 gallons or even 225 gallons. Such amounts, testified plaintiffs' expert, would make the concrete the consistency of water.
The evidence established that the concrete is purposely prepared at the factory with less water than required because of anticipated changes at the job site. The trucks are equipped with a large tank containing 100 gallons of water, for the purpose of adding to the mixture just before pouring. The addition of water is done only by the Dixie truck driver, who alone operates the truck.
Dixie presented testimony that its drivers never added additional water at their own behest but only on specific instructions by the contractor or others at the job site. In fact, the dray tickets bear a disclaimer, stating that the seller (Dixie) is not responsible for the quality of any concrete to which additional water has been added by the purchaser or at his request. The disclaimer also states the driver of the concrete truck will make no alterations in the mix without specific signed authorization by the purchaser or his superintendent.
There was testimony that an employee of Dixie named Mike Tamborella, a concrete salesman, was on the job site while the slab was being poured. Both Schaefer and LaBorde indicated that Tamborello in effect supervised the pouring of the concrete. They testified they knew nothing about concrete and left it to Tamborello to decide whether to add water. Although each had signed for several of the loads of concrete, they denied ever instructing any of the truck drivers to add water.
Tamborello was deceased by the time of the trial; thus, the only evidence regarding his role came from Schaefer and LaBorde on the one hand, and from the Dixie witnesses on the other. Dixie's vice-president, Charles Kahn Jr., testified that Tamborello was a salesman, that he provided service to his customers by going to the job to be sure the trucks did not run out of concrete. However, he was not responsible for placement of the concrete; that is usually directed by the cement finisher. Kahn stated Tamborello would have been well-aware of the effect of water on concrete mixtures. Tamborello was helpful to his customers as a part of his job.
Kahn testified the amounts shown on some of the tickets50, 60, 90, 225 gallonswere too much water, which dilutes the ultimate strength of the concrete. The maximum to add would be 20 gallons; the usual amount would be five to ten gallons.
Kahn stated that the 250-gallon addition of water shown on one ticket could have been accomplished by adding water from other concrete trucks at the job site when the water in the truck pouring the concrete had been exhausted. He stated such large amounts would only be added at the customer's request. Drivers adding water on their own are subject to dismissal. Kahn could not identify any signatures on the dray tickets as belonging to Dixie drivers. He admitted, however, that the original dray tickets were returned to Dixie's office *118 after delivery and the amounts of water added would have been seen by office personnel if the tickets were examined.
When there is evidence before the trier of fact which furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Canter v. Koehring Company, 283 So.2d 716 (La.1973).
Looking at the evidence, we cannot say the jury was clearly wrong in finding Dixie negligent. The jury found the concrete contained no hidden defect; therefore, they must have relied on the evidence of addition of excessive water in assessing fault against Dixie.
Whether Dixie employees added the water at their own behest or whether it was added at the direction of others on the job site, Dixie and its employees knew or should have known that the large amounts added would weaken the concrete to a state of near-uselessness. Dixie had a duty to use care in the manufacture of its product and it had a duty to warn the ultimate customersthe Troyersif it knew or should have known its product was dangerously adulterated by others. See Wurst v. Pruyn, 250 La. 1109, 202 So.2d 268 (1967); Town of Winnsboro v. Barnard & Burk, Inc., 294 So.2d 867 (La.App. 2 Cir.1974).
Further, although it was not the weakness of the concrete alone that led to the failure of the slabthe insufficient number of pilings was the major causethe plaintiffs proved by a preponderance of the evidence that the weakness of the concrete contributed to the cracking of the slab. Although Dixie's experts testified to the contrary, it was the jury's province to determine the amount of weight to attribute to their testimony. See Guidry v. Davis, 382 So.2d 250 (La.App. 3 Cir.1980). We find no clear error in their assessment of 10% fault against Dixie.

Liability of City of Kenner
The plaintiffs seek to hold the City of Kenner vicariously liable for the alleged acts of its former employee, Royce Waters, who was the Kenner official responsible for approval of construction plans and issuance of building permits at the time Webster Homes began building the Troyers' house. Waters was made a defendant on the main demand and on the third-party demands, but was never served. At the time of trial, he apparently could not be located. There was some indication he had moved out of state.
The demands were based on Schaefer's allegations that the building plan was revised at Waters' insistence. Schaefer said Waters told him he would revise the plans for $50 and indicated the plans would not be approved otherwise. He claimed he paid Waters the money, Waters told him how to redraw the plans, he redrew them to Waters' directions, and the permit was issued.
Portions of Schaefer's testimony were impeached on cross-examination, when conflicts between his trial testimony and his earlier deposition were brought out. First, Schaefer had not mentioned Waters' alleged demand for payment in his first deposition; then, when he mentioned it at a later deposition, he stated it was a payment by check; at trial he claimed it was made in cash.
Schaefer had not indicated previously that he felt constrained to have the redesign done by Waters, but at trial he implied that was a requirement of the situation.
According to Keith Chiro, who was deputy chief of code enforcement and inspection for Kenner at the time of the trial, in 1977 the Kenner building code required that plans be stamped when approved by the Kenner authorities.
In contrast, Schaefer was unable to explain why neither set of the plans in evidence bore any stamp indicating acceptance by the city.
In addition, Schaefer also claimed that Waters told him to decrease the number of pilings specified in the original design, yet in a deposition several years earlier Schaefer had stated that Waters required more pilings in the redesign.
The only direct evidence of Schaefer's allegations against Waters was Schaefer's *119 own testimony. Even LaBorde's testimony regarding the situation was based on what Schaefer told him, because it was Schaefer who dealt with obtaining building permits.
In his oral reasons for judgment the trial judge stated:
"The Court finds that ... Kenner's approval of the building plans and the input of Royce Waters, public works director, if any, into those plans is not the causing fact, or legal cause of the den slab failure, or of other alleged defects in the house.
The Court finds that the testimony of witness Schaefer was successfully impeached by the City of Kenner. His statements on the stand [were] shown to be considerably different and contradictory to previous testimony in his depositions. Yet, the entire claims against the City of Kenner are developed from information received from Mr. Schaefer * * *.
The Court finds the evidence to be overwhelming that the slab failure in the den was caused by slab construction not being in accordance with design.
[O]nly two [of the experts] ... took levels... to determine if differential settlement had occurred, which would indicate piling failure. They found no differential beyond construction tolerances. And the Court concludes that there has not been any piling failure; therefore, the approval of plans by the City of Kenner and/or the input into those plans by Royce Waters, if any, was not a legal cause of plaintiffs' loss."
Judging the credibility of witnesses is within the province of the trier of fact. The trial judge's evaluation of Schaefer's credibility was reasonable and we find no reason to disturb his finding. See Canter, supra, and Smith v. Lumbermen's Mut. Cas. Co., 414 So.2d 1281 (La.App. 3 Cir. 1982), writ denied, 417 So.2d 367. Under the circumstances, we cannot say the trial court erred in finding that plaintiffs had failed to prove their case against Kenner by a preponderance of the evidence.
Given our conclusion on this point, it is unnecessary to discuss the other defenses raised by Kenner (specifically, that no private duty is owed by a political subdivision to individuals for enforcement of building codes; that Waters, if he mandated a particular design, was acting outside the course and scope of his employment; and that prescription has run on any claims against the city).

Amount of Damages
Dixie and USF & G complain the damage award is too high. The plaintiffs complain the award is insufficient and, further, that they are entitled to attorney's fees and to refund of the interest payable on their mortgage loan.
The jury awarded the plaintiffs $120,000 for property damage and expenses, and $15,000 each to Mr. and Mrs. Troyer for mental anguish.
Henry Robards, who testified for the plaintiffs as an expert in architecture, stated the house cannot be repaired and must be torn down. He knew of no other option. He estimated its value as $113,000. Dixie complains this estimate is faulty because, first, it does not address other available options and, second, it does not allow credit for the value of the land on which the house sits or for salvageable items from the structure that could be sold to junk dealers. Thus, claims Dixie, the plaintiffs failed to mitigate their damages.
Sammie Miller, an expert in real estate valuation, estimated the value of the land as being $50,000-$60,000 in 1986 and the value of the house and lot together at that time, if in perfect condition, as $134,000. She stated, however, that the house "as is" cannot be sold and has no value at all.
Several defense experts testified the slab could be repaired for less than $10,000. They described various methods, including removal of the old slab and pouring of a new one and installing more pilings in a newly available method that would not require going through the roof.
Frederick Guice, an expert in real estate appraisal, testified that on today's market, in perfect condition, the house would be worth $108,000. Assuming the slab could *120 be repaired for approximately $10,000, he felt the house could be sold "as is" for about $76,400. Even in its present condition, he stated, the house has value and can be sold.
We agree that the award for property damage is excessive, on the evidence shown. The jury apparently did not consider that the land on which the house stands is of value, with or without the house. A potential buyer, however, might wish to have the house torn down in order to build a new, more stable home. Nor should the plaintiffs be limited to repairing the slab in the various methods described by the defense experts.
Accordingly, we conclude the most we can lower the award is by $30,000, a minimum allowance for the value of the land, bearing in mind the guidelines we must follow in altering damage awards. We find, therefore, that $90,000 is the highest amount that was reasonably within the jury's discretion, considering all the evidence, and we reduce the property damage award to that amount. See Coco v. Winston Industries, Inc., 341 So.2d 332 (La. 1976).
We do not, however, lower the awards for mental pain and anguish, in the amount of $15,000, finding those amounts to be within the great discretion of the trier of fact.

Attorney's Fees and Mortgage Interest
We do not agree with the plaintiffs' claim that they are owed attorney's fees and the interest charges they have paid on the money they borrowed to finance construction of the home, however. The damages awarded in this suit were based on negligence and breach of contract rather than in redhibition. Therefore the cases cited by the plaintiffs are not applicable.

Co-Defendant's Inability to Pay
Dixie claims a mistrial should have been granted because the evidence regarding undercapitalization of Webster Homes was prejudicial, by disclosing the co-defendant's inability to pay.
We do not agree. The testimony was admitted for the valid purpose of "piercing the corporate veil" and showing that Schaefer and LaBorde used the corporation as an alter ego. Accordingly, we find no error in the court's denial of the motion for mistrial.

Appeal of LaBorde and Schaefer
Although LaBorde and Schaefer appealed, they failed to file briefs before this court. Under the Uniform Rules of Louisiana Courts of Appeal, Rule 2-8.6, failure to file a brief can result in dismissal of the appeal as abandoned, following 30 days' notice. As no 30-day notice was sent to LaBorde and Schaefer, however, we shall give summary consideration to the merits of their appeal, which presumably turned on the finding of personal liability against them individually.
The jury "pierced the corporate veil" in assessing fault against LaBorde and Schaefer, finding that they "disregarded the entity of the corporation" and "made it a mere agent for the transaction of their own private business." We find no error in this verdict. The evidence established conclusively that the corporation was undercapitalized from the start, it functioned only briefly, and was defunct long before plaintiffs filed this suit. It had no assets nor was any insurance ever obtained in the corporate name, contrary to Schaefer's representation to the Troyers when negotiating the contract to build the home. It is plain that these defendants used the corporate form as a device behind which to shield themselves and the corporation was never a separate, functioning entity.

Decree
For the foregoing reasons, the judgment is amended to reduce the property damage award from $120,000 to $90,000. In all other respects the judgment is affirmed.
AMENDED AND AFFIRMED.