679 So.2d 990 (1996)
Jesse C. HARRIS, et ux, Plaintiffs-Appellees,
v.
Josiah C. WILLIAMS, et al., Defendants-Appellees,
Robert A. Turner, Third-Party Defendant-Appellant.
No. 28512-CA.
Court of Appeal of Louisiana, Second Circuit.
August 23, 1996.
*991 Stephen A. Glassell, Shreveport, for Jesse C. Harris and Alice Cleveland Harris.
Richie & Richie by C. Vernon Richie, for Josiah C. Williams, Jr. and Sula Slaughter Williams.
Robert A. Jahnke, Shreveport, for Robert A. Turner.
Charles W. Strickland, Shreveport, for McDaniel-Sewell Engineers & Contractors, Inc.
Before MARVIN, C.J., and SEXTON and STEWART, JJ.
MARVIN, Chief Judge.
This multi-party redhibition action, tried over a 12-day period, arose from the sale of a home south of Shreveport by Williams to Harris in 1990, after the third party defendant, Turner, a contractor-subdivision developer, built the home for Williams in 1986. La.C.C. arts. 2520, 2762. The amended judgment in favor of Harris rescinded the 1990 sale and awarded a net amount of $85,000 for the return of the purchase price against Williams. A money judgment in the same amount was rendered in favor of Williams on his third party demand against the builder, Turner, who in turn had hired another third party defendant, McDaniel, a civil engineer, to verify the soil conditions on the lot and to design the foundation for the home.
Shortly after the amended judgment was rendered Harris and Williams compromised and settled the main demand. The sole appellant is Turner, the builder, who essentially contends on appeal that the evidence does not show any breach of his 1986 building contract with Williams; that he neither knew nor should have known of the defective soil condition, and in the alternative, that if the judgment is affirmed, he should be awarded a judgment on his third party demand against McDaniel.
We reverse and render judgment in favor of Turner, the builder.

SUMMARY
The court found that Turner had the ultimate responsibility for the hidden defects in the soil that caused excessive moisture retention in one section of the yard, as well as interior and exterior cracks and separations in the walls, the brick veneer and mortar, and the concrete foundation or slab of the home. Turner's third party demands against McDaniel, with whom he contracted to verify the soil conditions and design the foundation of the home, were rejected.
According to this record, neither Turner nor McDaniel took a soil boring on the Williams lot. The trial court, on the one hand, found that Turner breached his contract with Williams by not taking a soil boring on the lot. On the other hand, the court found that McDaniel's performance was not substandard, apparently because no expert testimony was offered to show or suggest a defect in the design or construction of the foundation of the home on the lot in the particular subdivision.
The court heard opinion testimony by two civil engineers: McDaniel, the third party defendant, and James Mohr, whom Harris hired within a few months after he purchased the home in 1990 and discovered the wet condition of the soil near one part of the home. Mohr agreed that if one or more soil borings had been made in the subdivision on similarly situated and nearby lots or streets, it would be "sound engineering practice" to *992 visibly observe the trenches for foundation footings on the Williams lot and "assume that all the soil in that area [was] similar."
McDaniel had designed and inspected foundations for residences on five lots in this subdivision over an 18-month period before Turner contracted with Williams in 1986 to build the home in question on Lot 4 of the subdivision. Two of the five lots (Lots 33 and 41) were immediately across the street from the Williams lot. The other three lots (Lots 1, 42 and 43) were on the same street, within 500 feet or less of the Williams lot. The street, originally called Maxine Drive and later renamed Oakfield Drive, is 60 feet wide and about 1250 feet long. See subdivision plat reproduced below.
Before the street was paved, two test borings were made on the street, one being taken "right in front" of the Williams lot, according to McDaniel. The color, texture and other observable characteristics of the soil on the Williams lot when trenches were dug for footings and utility connections were identical to the characteristics of the other five lots and of the soil underlying the street. Soil borings made on the Williams lot after the action was instituted also generally corresponded to soil borings earlier made before 1986 in two places along the relatively short street, according to McDaniel. This plat showing the street, the lot in question and the other five lots mentioned is reproduced:
*993 
Noting that the design and construction of the home and its foundation were not otherwise defective, the trial court specifically found that the home was built "on defective soil which was totally unsuitable for building purposes" because it contained a "pit" of excessively moist "gray material" which did not adequately support the concrete slab. We agree with the trial court's determination of cause in fact.
The more critical issue is whether either or both the builder and the civil engineer are legally liable for the soil defect where soil testings and borings had been made in two locations in the street on which the lot fronts; the engineer had designed and inspected foundations for the builder on five other similarly situated and nearby lots in the subdivision; and no one observed any difference in *994 the trenches dug for foundation footings in the soil of the lot in question. The building contract formalized the standard building practice or requirement that the foundation footings extend at least six inches into "undisturbed natural soil."
Under C.C. art. 2762 a builder is not responsible for defects of the soil unless the factual circumstances allow the conclusion that he knew or should have known of the defect when he constructed the home. Wurst v. Pruyn, 250 La. 1109, 202 So.2d 268 (1967). This record is devoid of any evidence that suggests or allows the conclusion that the foundation footings or beams extended to or into the "gray foreign material" in 1986, which material was found to have caused the cracks in the home in and after 1991.

APPLICABLE LAW
The building contract was executed before the effective date of the New Home Warranty Act, La.R.S. 9:3141 et seq., which now provides "the exclusive remedies [and] warranties... as between builder and owner relative to home construction[.]" § 3150. The trial court declined to apply the Act retroactively.
Notwithstanding that Turner owned the lot upon which he contracted to build the home for Williams, selling the property to Williams after construction was completed, the trial court correctly addressed Turner's liability to Williams under C.C. art. 2762, the building contracts article, rather than under C.C. art. 2520 et seq., the redhibition articles applicable to contracts of sale. See Wurst v. Pruyn, supra and Degeneres v. Burgess, 486 So.2d 769 (La.App. 1st Cir.1986).
Turner's appeal does not question the trial court's choice of law, but only the court's application of the law to the evidence presented at trial. Before discussing the evidence, including Turner's specific and express obligations under the building contract, we summarize the builder's general or implied obligations to the owner for whom he constructs a building.
C.C. art. 2762 provides that the builder of a home or other structure which "fall[s] into ruin either in whole or in part, on account of the badness of the workmanship ... shall bear the loss" suffered by the owner. The builder's liability under this article is not strict or absolute, nor is it to be presumed from the mere fact that the building develops a structural problem after construction is completed. The owner seeking to recover from the builder under Art. 2762 must prove by a preponderance of the evidence the existence and nature of the construction defects, and that the defects were caused by the builder's use of materials, equipment or work methods which the builder knew or should have known were faulty, defective or unsuitable for the particular construction job. Nichols Ford Company, Inc. v. Hughes, 292 So.2d 345 (La.App.2d Cir.1974); Melder v. Gassiott, 436 So.2d 628 (La.App. 3d Cir.1983).
Notwithstanding that the builder's knowledge of proper construction methods and materials is deemed superior to that of the owner with whom he contracts, the owner must nevertheless prove that the builder either lacked or failed to exercise the expertise reasonably expected of one in his trade in performing the work or in selecting suitable materials and equipment. Wurst v. Pruyn; Melder v. Gassiott, both cited supra.
When, as here, the alleged construction defect involves the soil upon which the home was built, the builder's Art. 2762 liability extends to soil defects which were or should have been apparent to the builder before or during construction, in the exercise of proper judgment. The builder is not responsible, however, for a latent or hidden defect in the soil, that is, a defect which was neither apparent to nor reasonably discoverable by the builder during construction. Wurst v. Pruyn, supra; Matthews v. Rudy, 4 La.App. 226 (2d Cir.1926).
We shall detail the fact and opinion evidence in this record.

FACTS
The home is located in the Metropolitan Estates subdivision in the town of Keithville, south of Shreveport in Caddo Parish. The home was built in 1986, on land that was once part of a dairy farm that discontinued its operation about 1960. One witness who had worked on the dairy farm as a child recalled a shallow pond, about 20-30 feet in diameter, *995 having been located near the site where this home was later built. No visible sign of the pond remained, however, when construction began in 1986, and no expert testimony was elicited about the effect this pond may have had on the soil conditions at the building site.
The developer of the subdivision, Turner, drafted the plans and specifications for the 2,500 square foot home on the 1.3 acre lot. Turner had built homes on other lots in the subdivision over a period of about 18 months before he contracted with Williams for the construction of this home in June 1986.
The home was designed and built with a "post-tension" concrete foundation or slab. Before the concrete was poured into the ground inside the wooden forms marking the slab's perimeter, steel cables or tendons designed to reinforce the concrete were attached to the forms at designated locations. After the concrete was poured and before any other construction work was done, the reinforcing cables or tendons in the slab were "stressed" with a specified amount of pressure, causing the concrete along the perimeter of the slab to be compressed toward the slab's center.
The stressing of the cables in this manner anticipates and allows for movement of the concrete in the opposite direction, away from the center, when the weight or load of the structure is placed on the slab thereafter, primarily at the slab's perimeter. The post-tension foundation design also allows for the inevitable movement or settling of the concrete slab into the underlying soil which occurs after construction, when clay soils common to north Louisiana expand and contract with changes in ground temperature and moisture.
When this home was built in 1986, the use of post-tension foundations in residential construction had become commonplace. The former industry requirement that such foundations be designed and inspected only by a licensed civil engineer had been eliminated. Some builders, like Turner, continued to have their post-tension foundations designed and inspected by a civil engineer, while other builders performed these tasks themselves.

Building Contract
The building contract between Turner and Williams did not stipulate whether the home's foundation was to be designed by Turner or by a civil engineer. Williams paid cash for the home, eliminating any mortgage lender's involvement in overseeing the construction process.
After giving a general description of the soil upon which the home would be built as "sandy clay," the building contract expressly required Turner to "verify soil conditions with FHA, VA, MPS [minimum property standards] for structural safety prior to construction." The contract also stipulates that the depth of the concrete slab's grade beams or footings shall be "6 [inches] min. into undisturbed soil," in accordance with industry standards requiring placement of the foundation footings at least six inches into the natural soil underlying any fill material brought to the site to level the ground upon which the home is built. Our emphasis and brackets.
The trial court found that Turner breached the above emphasized contract provisions. We shall later discuss the trial court's specific findings.

Foundation Design
Turner hired the McDaniel-Sewell civil engineering firm to design and inspect the home's post-tension foundation. As part of this undertaking, the engineering firm was required to determine various characteristics of the soil at the building site, including the type or types of soil at various depths, such as stiff clay, medium clay or sandy silt, and the load-bearing capacity and plasticity of each layer or stratum of soil.
The term "plasticity" signifies the extent to which the soil will generally move or shift when exposed to normal variations in temperature, moisture, etc. The "plasticity index" of soil is quantified by a number between zero and 70, with lower numbers signifying less movement and higher numbers denoting more movement.
The natural soil in this subdivision, according to the Caddo Parish Soil Conservation book commonly used by engineers and builders to ascertain the general soil conditions *996 throughout the parish, is a type of clay called Metcalf soil. The plasticity index of Metcalf soil is generally below 20 within the first three feet of depth, ranging from 20-42 between three and five feet. This type of soil normally has sufficient load-bearing capacity to support residential construction.
The McDaniel-Sewell engineering firm that Turner retained to design this foundation in June 1986 had designed and inspected post-tension foundations for Turner on five other lots in this subdivision since December 1984. As mentioned, two of these lots were directly across the street from this home, and the other three were located on the same street, within a radius of 500 feet from this lot. Both Turner and John McDaniel, the engineer who designed this foundation, testified to the similarity in color, texture and other readily observable characteristics of the soil on each of the respective lots, including this lot.
Based on his experience with the soil in the area, which was consistent with the data listed in the Caddo Parish soil survey reference manual, McDaniel designed the foundation of this home to withstand a soil plasticity index (PI) of up to 45, slightly higher than the highest PI reported in the parish soil survey for the native soil in the area. The PI for which the foundation is designed is an important factor in determining the number and placement of the exterior or perimeter concrete footings or grade beams, those which will bear most of the home's weight.
The foundation plans required that the exterior grade beams be at least 20 inches deep, or whatever greater depth would allow the beams to be placed at least six inches into undisturbed natural soil, depending on the depth of the fill dirt placed on the lot. This foundation met those requirements.

Foundation Construction
The 1.3 acre lot upon which this home was built contained more than 30 mature oak trees, only a few of which were in proximity to the construction site. No trees were removed from the lot when the ground was cleared of grass and underbrush with a bulldozer before construction began. The worker who cleared the lot for Turner, Gerald Hayes, also delivered, spread and compacted several truckloads of fill dirt from the Red River to form a raised "pad" for the home and to facilitate surface drainage away from the foundation. The fill dirt was spread evenly across the lot, which was essentially level and contained no visible holes or pits. Neither the 18,000-pound bulldozer nor any of the dump trucks weighing about 50,000 pounds when fully loaded with fill dirt, had trouble traversing the lot, as they often do where the ground is soft or wet.
After the lot was cleared, Turner staked the area where the home was to be built on the lot. A plumber, Harold Whitlock, then laid the plumbing lines for the home in the ground, from the water main in the street to and through the home, and a short distance behind the home to a septic tank. The depth of these lines ranged from 1-2½ feet. Whitlock testified that he saw nothing unusual in the soil he encountered in this work.
A cement contractor, R.L. Mason, dug the ditches or trenches for the grade beams or foundation footings called for by McDaniel's foundation plan and supervised the pouring of the concrete into the slab forms placed at the site by a carpenter. Mason testified that he dug some of the trenches himself, and supervised the remainder of the digging. The trenches were dug to accommodate the grade beam width of one foot. Because the fill dirt on the lot extended to a depth of about 18 inches, the grade beam trenches were dug to a depth of 24 inches to meet the "six inches into undisturbed soil" requirement of the foundation plans. Mason said it was easy to tell from visual observation where the fill dirt ended and the natural soil began. He recalled nothing unusual about the characteristics of the natural soil he observed when the trenches were dug.
Another subcontractor, David Pattridge, furnished the concrete for the job, fabricated the reinforcing steel cables or tendons for the foundation and supervised their placement in the slab forms before the concrete was poured. Pattridge testified that he routinely makes a visual check of the grade beam trenches to ensure that they extend the proper depth into natural soil, and that he noticed nothing undesirable or inappropriate *997 about the trench depth or soil appearance on this job.
Before the concrete was poured, an employee of the McDaniel-Sewell engineering firm, Lee Hernandez, conducted a formal inspection of the foundation layout, including the number and placement of the grade beams and the reinforcing steel cables. Hernandez was also present when the cables were partially and then fully stressed at the respective intervals of roughly three days and two weeks after the pour. Hernandez testified that he did not remember any problem with the manner in which this foundation was constructed, or with the surrounding soil, and said he would not have approved the pouring of the concrete had he noticed any deviation from the foundation plans. Turner, who was present for the pre-pour inspection, testified similarly.
The concrete was delivered to the site in nine or ten cement truckloads, each of which weighed about 80,000 pounds. The cement trucks had no difficulty driving across the lot, where they backed up to within a few feet of the slab forms, pouring concrete at various points around the perimeter of the home, according to several witnesses who were present when the pouring occurred.
By all accounts, the steel cables or tendons in the concrete slab were appropriately stressed before construction of the home began. No problems with the foundation were thereafter noted by Turner or by others working at the site, according to this record.

Post-Construction Developments
Williams and his family moved into the home at the end of August 1986. Within a year thereafter, the home had developed several interior and exterior hairline cracks or separations, including a few hairline cracks in the slab. Builders and civil engineers consider hairline cracks not structural defects and of no consequence. When Williams brought the cracks to Turner's attention, Turner attributed them to normal settlement of the slab into the underlying soil, as did John Bowman, a civil engineer who inspected the home in January 1990 for another prospective purchaser (not Harris), who was ultimately unable to arrange financing for the home.
Harris paid cash for the home and made his own inspection inside and outside the home before the closing on May 31, 1990. He asked Williams about the interior and exterior cracks and separations he observed, accepting Williams's explanation that they were merely cosmetic and not indicative of a structural problem.
According to this record, there was no noticeable increase in the number, location or extent of the cracks from 1986-1987 until after the sale of the home to Harris in May 1990. After the sale, however, Harris discovered additional cracks and separations inside and outside the home and found the ground on the north side of the home, between the kitchen/breakfast room and the concrete driveway, to be moist or wet even during dry weather.
The rough sketch below, not to scale, depicts the general layout of the home, the wet area mentioned above, and the location of three soil borings (# 1-3) taken by Southwestern Laboratories in April 1991. We discuss the borings infra.
*998 
After attempting to discuss his findings with Williams, Harris hired James Mohr, a civil engineer, to inspect the foundation of the home and the area of wet ground near the kitchen and the laundry room. Mohr made his first inspection of the home on August 31, 1990, generally concluding that the foundation was then "structurally sound," notwithstanding the interior and exterior cracks and separations Mohr noted in his report. Mohr considered the surface water drainage from the "almost flat lot" to be adequate, finding no ponding of water near the slab.
Based on the proximity of the wet ground to the kitchen and laundry room, Mohr initially suspected that waste water from these rooms may have been directed through a sewer line extending in a northwesterly direction from the house instead of through lines emptying into the septic tank at the southwest corner of the home. No such northwesterly line existed, however, and a series of plumbing tests of both the incoming fresh water and outgoing sewer lines, conducted by Harris and by several plumbers from September 1990-August 1991, caused Mohr to rule out a plumbing leak in these lines as the source of the ground water.
Mohr initially hypothesized that there may have been an underground spring on the lot, but considered this unlikely because the lot was able to support a number of mature oak trees.

Soil Report
In April 1991, and before the plumbing leak theory was put to rest, Harris hired Southwestern Laboratories to take soil samples or borings from three locations along the perimeter of the home, as shown on the above sketch. The first boring was made at the rear of the home, near the south wall of the garage. The second boring was taken from the wet area between the kitchen and *999 the driveway. The third boring came from the front yard, at the southeastern corner of the home.
The soil samples were analyzed and tested by Southwestern Labs, as reflected in its April 10, 1991, report, which was marked as exhibit P-18 and frequently mentioned during the trial. The report bears the signatures of two geotechnical engineers, neither of whom was called as a witness at trial, apparently because the contents of the report fell within the expertise of the civil engineers who testified, Mohr and McDaniel.
Each of the three soil borings was drilled to a depth of ten feet. The first two feet of each boring contained the fill dirt, generally described as a "clayey sandy silt." The deepest level of each boring, from 8-10 feet, contained "firm fine silty sand," over which lay "stiff clay" from 6-8 feet of each boring. The soil type at each boring from 2-6 feet varied:

Depth Boring # 1 Boring # 2 Boring # 3
2-4 ft. Very stiff clay Medium clay Medium silty clay
4-6 ft. Very stiff clay Medium clay Stiff clay

The plasticity index of soil at these depths (2-6 feet) was lowest (indicating less soil movement) at Boring # 3 (PI of 24) and highest (indicating more soil movement) at Boring # 2 (PI of 33). The PI at Boring # 1 was about 30. These PI's were well below McDaniel's foundation design specification of 45.
The soil report quantifies the moisture content of the soil in each of the borings: 14-20 percent for the fill dirt in the top two feet; 20-25 percent in the upper two clay strata (2-4 and 4-6 feet); 17-32 percent in the lower clay stratum (6-8 feet); and about ten percent in the silty sand at the bottom two feet of each boring. The letter accompanying the report states:
Water was not encountered in any of the borings. However, the upper samples of Boring 2 were excessively wet. This condition appears to be perched at the top of the clay stratum.
As mentioned, the Boring 2 soil came from the "wet area" noted by Harris on the north side of the home.
The soil report also lists the compression of each soil type in pounds per square foot (PSF), a figure which the engineers correlated with the soil's load-bearing capacity. As with the PI readings, the major differences appeared at the 2-6 foot depths:

Depth Boring Boring Boring
 # 1 # 2 # 3
2-4 ft. 4280 1428 1447
4-6 ft. 5227 1876 2238

Though Mohr later opined that the compression readings at Boring # 2 and at the upper level of # 3 were inadequate to support residential construction because they were less than 2000 PSF, Mohr did not initially express any concern or alarm about these compression or load-bearing differences, nor about the variations in soil types at the three borings, listed above.
In his letters to Harris's attorney written in May and June 1991, after he received the April 10, 1991, soil report, Mohr made no mention of the soil data and variations as a cause for concern, saying only, "As you know from the Southwestern Labs test, the soil is expansive, having a plasticity index in the 30s. Thus, if it lost [sic] a pint of water a day, in a few months we would have a lot of water [in the ground]." Our brackets.
After receiving the April 10, 1991, soil report, which indicated that no standing water was encountered in any of the borings, Mohr concluded that there was probably no underground spring on the lot, as he had earlier hypothesized. Mohr encouraged Harris to continue with the plumbing tests during the summer of 1991.

Inspection of August 27, 1991
On August 27, 1991, while this action was pending, Harris, Mohr, Williams, Turner and two plumbers met at the home to conduct another round of plumbing tests and to examine the soil on the north side of the home. According to Mohr's letter written to Harris's attorney on August 28, 1991:
[a plumber's] assistant dug three holes on the [north] side of the house in the wet area.... [T]he three holes showed the concrete beam for the house to be about 24 inches deep. There was a sandy loam for about 16 inches; then a gray homogeneous clay material extended as far as the hole was dug. Using a probe rod in the bottom of the 3½ foot hole, the gray clay *1000 seemed to extend another three feet (sic). This gray material was ... damp to wet in all three holes, [especially] immediately under the grade beams.

All the dirt has a very bad odor when you first break it open ... like methane or some other hydrocarbon ... [but the odor] would soon dissipate. The gray material was homogeneous, meaning that it was not in strata nor was it mixed up with any other kind of material. It reminds me of a slush pit [used in] a drilling operation....
If you were to look at the soil test made by Southwestern Labs, you would see that [their] boring # 2 is the one in the general area of the place we dug the three holes. There is a lot of difference between boring # 1 and boring # 2. Boring # 2 and # 3 are even similar; therefore I believe the pit extends between [these borings and under] the house....
When I left the site yesterday, I told Mr. Harris to have [another] plumbing test run in a particular way .... I did not think of the great contradiction in the types of soil until after I had left.... I called him this morning and told him not to do the plumbing test.... He is ... to get me some samples of the gray material so I can take it to a geologist. Hopefully, we can find somebody to tell us where some [oil] wells have been drilled. (Our emphasis and brackets.)
While Mohr and Harris were investigating the drilling site theory, which was never substantiated, Mohr became "convinced [that] there is a pit [under the house] filled with a material not native to the site. This odorous material is causing my concern for the inhabitants of the house. [T]ests should be made on the material and the gas it is producing." Our brackets.
The "smelly dirt," as Mohr called it, was then tested for methane, radon and hydrocarbon gases and for various petroleum-related chemicals, with negative results.
After the "gray material" was discovered in the holes dug on the north side of the home in August 1991, Harris found the same material in a hole he dug on the opposite or south side of the home, near the master bedroom (see above sketch) in November 1992. The "gray material" was not found anywhere along the rear perimeter of the house, near the master bathroom, the garage and the patio. These findings were generally consistent with Mohr's interpretation of the varying soil conditions shown in the soil report, causing Mohr to conclude that the "pit" of "chemically laden, foreign gray material" extended under the entire front and middle sections of the house, with only the rear being supported by the natural clay soil.

TRIAL TESTIMONY
At the trial in 1993, it was undisputed that the concrete slab had experienced excessive movement, far beyond the normal settlement which occurs when the underlying clay soils expand and contract within anticipated limits. This movement had clearly caused structural damage to the home, which had developed more than 70 visible interior and exterior cracks and separations.
The civil engineer who designed the foundation, McDaniel, opined that the slab movement was not caused by any defect in the foundation itself or in the underlying soil. McDaniel attributed all of the problems to the introduction of water under the slab after construction was completed.
Mohr agreed that the presence of water under a slab is the most common cause of foundation problems, even when a slab is built on suitable soil. He steadfastly maintained, however, that the problems here were caused by a combination of ground water coming from an "unknown source" and the compositional differences between the "gray material" under roughly the front two-thirds of the slab and the "natural ground" toward the rear. Mohr said he had not abandoned any of the theories he had posited to explain the excessive movement, including the plumbing leak, the "oil field slush pit" and the "chemically laden foreign material" theories for which he had no corroborating factual support.
Mohr candidly admitted that he still did not know why the house was moving, even after having repeatedly investigated the *1001 problem for several years since August 31, 1990.
From his review of McDaniel's foundation plans, Mohr said the foundation design used here "looked stout." Neither Mohr nor any other expert witness opined that the foundation design was inadequate. Mohr testified that "no engineer would have anticipated" either the degree of movement that this slab had experienced, or the presence of a "foreign substance" or chemical under the slab.
Mohr, McDaniel and Turner each testified that when a builder hires a civil engineer to design a foundation, the engineer has the duty to determine the soil conditions at the site. The precise nature of McDaniel's duty here was governed by the building contract between Williams and Turner, which required that the soil conditions be "verif[ied] with FHA, VA, MPS [minimum property standards] for structural safety prior to construction." Our brackets.
Though Mohr initially testified that the "better" way to verify soil conditions at a particular building site is to take a soil boring or sample from the site and have it scientifically tested, Mohr had no serious quarrel with McDaniel's having designed this foundation without a formal soil test being made on the lot. Mohr considered it acceptable for an engineer who has done other projects in a subdivision to design a foundation for another home in the same subdivision without taking a soil sample from the particular lot, if a soil sample from the subdivision has been tested and found to be consistent with the soil data described in the Caddo Parish soil survey manual. Mohr testified:
[I]f I never had done a foundation in that subdivision before, I'd make them go get a soil test.... But if I had already done [other] houses in that subdivision, ... I would look at [the prior] soil test [and] where it was [located] with respect to this house that I was asked to do. I'd get my Caddo book out and see if the soils changed; and if [the book and] my other experience [indicated that they] didn't, ... I would assume that all the soil[s] in that area are similar.

Q. And would that be considered sound engineering practice?

A. Yes. (Our emphasis and brackets.)
As mentioned, McDaniel had previously designed and inspected foundations for five other lots within a relatively short distance of this lot. He did not find, and the parish soil manual did not report, any significant soil variances in the area. McDaniel also testified that he was familiar with the results of a soil boring that had been taken from the 60-foot street "right in front of [this] house" before the street was paved. Both Mohr and McDaniel testified that soil conditions generally do not vary greatly over short distances in similar natural terrain.
Even had the soil from this lot been tested before construction began, Mohr said the FHA would have required only a single pre-construction boring to be taken from the lot, and would not have required more than one boring to compare the soil conditions at various places on the lot. According to Mohr, the multiple-boring comparisons, such as were made on this lot by Southwestern Labs in 1991, are generally reserved for investigating post-construction foundation problems, and are not routinely used or required at the pre-building stage, even under FHA standards. No other particulars of the FHA or VA "minimum property standards" were elicited at trial.
Notwithstanding his earlier descriptions of the wet material under the house as "gray clay" and "smelly dirt," Mohr testified:
I do not know what it is. I do not know if it's soil.... That grayish material is foreign to the area.... [I]t's not even natural dirt....
Q. Now the Southwest Lab says it's ... gray clay ... in their report. Are they incorrect?
A. I don't know.... I have no idea. That's out of my expertise as far as the classification, but I think it's clay.

Q. So it's out of your expertise then to classify this gray material as soil or anything else?
A. Well, no, I can tell it's soil, but
Q. Then it is soil?

*1002 A. Don't know. I don't know that it is. Yeah, I believe it's dirt with a chemical in it.... When you exposed it to air, it turned orange or brown ... [and] the chemical that [was] in it is gone.... I believe that once you get through with ... oxidizing the chemical you've got dirt. (Our emphasis.)
Mohr was asked a series of hypothetical questions about the soil conditions on the lot when the house was built. Having no personal knowledge of those conditions, and readily admitting that other witnesses who were present on the lot before and during construction were in a better position to testify to those facts, Mohr stated:
It is possible the pit of gray material has been under the slab in the same moist condition since the house was built.
The builder should have known the pit of gray material was not suitable to build on, and should have avoided it, if he saw it.

The gray material was not suitable for use as fill dirt, and the builder should have known it was improper if he brought it in.

The builder and the workers who laid the plumbing lines and dug the trenches for the grade beams should have noticed the pit of gray material if it was there before the slab was poured.

If the house was built on the pit of gray material, the ground would have been wet during construction and the various pieces of heavy equipment used by the construction workers would likely have gotten stuck or bogged down on the lot.
During the trial, Turner and each of the other witnesses involved in the construction of this home in 1986 were shown a sample of the "moist gray material" taken from the perimeter of the home by Harris in 1992. These witnesses consistently testified that they did not see or encounter a material in that condition at the building site. According to this record, the only fill material that was brought to the lot was "river sand" dug from pits near the Red River, which is an acceptable and commonly identifiable and used fill dirt. No heavy equipment mishaps occurred, either before or after the fill dirt was delivered.
Williams, who walked on the lot with Turner before the lot was cleared and "padded" with the fill dirt, said he did not notice any pits, soft spots or wet areas in the ground.
Both Mohr and McDaniel testified that if the ground underlying the foundation had been as wet during construction as it later became, serious problems with cracking and separation would likely have appeared within the first year of the home's occupancy. As mentioned, Williams and Turner noticed only a few hairline cracks in 1986-1987, and the condition of the home had not changed significantly by the time of Bowman's inspection in 1990, a few months before the sale to Harris.

TRIAL COURT FINDINGS
In reasons for judgment, the trial court stated:
After painstaking, careful review of the evidence, this Court is convinced that the house at 10578 Oakfield is constructed on defective soil which was totally unsuitable for building purposes.... The redhibitory vice or defect in the premises is ... the pit of gray foreign material ... underneath the house.... Unquestionably, these defects existed at the time of [the] sale [to Harris].... Obviously, [the same] condition existed at the time the house was built by Mr. Turner. (Our emphasis and brackets.)
After resolving the other issues raised in the main demand by Harris against Williams, which demand has now been settled and is not involved in this appeal, the trial court made these additional findings on the third party demand of Williams against Turner:
Mr. Mohr was of the opinion that because at least some of the exterior grade beams to the house [were] sitting on and in the gray foreign material [in August 1991], they were not placed six inches into undisturbed natural soil [at the time of construction in 1986], as was required by standard building practices [and by the building contract between Turner and Williams].... [Mohr] was of the further opinion that the builder, Mr. Turner, should have seen and recognized the problem with the gray material, and [should not] have *1003 built the house on top of the pit containing this gray material....

Mr. Turner took no core drillings and had no tests run on the soil under this house prior to construction. He did not take the steps necessary to "verify" the soil conditions for structural safety prior to construction, as required by the [building] contract. Had he done so he would have likely discovered that it was unsuitable for construction purposes.

With the exercise of proper care and judgment, Mr. Turner should have known that the gray material was not suitable for construction purposes and should not have built this house on the pit of gray material. (Our emphasis and brackets.)
The court dismissed Turner's third party demand against the McDaniel-Sewell engineering firm, finding that Turner did not meet his burden of proving "the prevailing standard [of care] for engineers in the Shreveport locale; ... any breach of a standard by McDaniel-Sewell," nor that any such breach "was a cause in fact of the damages sustained by the Harrises."
Relying on Mohr's opinion about the gray material found in August 1991, the trial court thus found that the "gray material" was not only then present, but was in the same "foreign" and "unsuitable" condition when the house was built in 1986 as it was several years later, when Williams sold the house to Harris in 1990 and when Mohr observed the grade beams "sitting in the wet gray material" in the inspection of August 27, 1991, discussed supra.

DISCUSSION
Williams, as the party alleging that any redhibitory vice or defect in the home at the time of the 1990 sale to Harris was attributable to a construction or a soil defect existing in 1986, had the burden of proving that the defect existed, and was known by or reasonably apparent to Turner at the time of construction. See Nichols, Melder, Wurst and Matthews, all cited supra.
The sole basis for the court's findings that a soil defect existed when the home was built, and that Turner knew or should have known that the soil was unsuitable for construction, was the testimony of Mohr, an expert witness who had no personal knowledge of the soil conditions when the home was built. The assumed facts on which Mohr based his opinions were not proven, but were denied by each witness who had personal knowledge of the lot's condition before and during construction, including Williams, Turner and numerous non-party witnesses who performed soil-related work at the building site.
Although some of these witnesses had only a general recollection or memory of this job, each testified that the jobs they remember with greater specificity are those where problems arose, not those that went smoothly. The testimony of these witnesses was not contradicted by any other witness with personal knowledge of the building site conditions, and was generally corroborated by other evidence, including the evidence that no serious delays or problems were encountered during construction, and none arose within the first few years of the home's occupancy, as they likely would have if the home had been built on unsuitable soil.
The trial court was arguably faced with two views of the evidence, one being that the soil was suitable for construction when the home was built and the other being that it was not. The former view was presented by the consistent and uncontradicted testimony of witnesses with personal knowledge of the pertinent facts. The latter was based entirely on Mohr's opinion testimony which rested on assumed facts or possibilities that were not borne out by any other evidence. This appeal thus presents an issue as to the competency of the evidence before the trial court, rather than presenting the more typical credibility call made by the trier of fact on the basis of two permissible views of the evidence, a la Rosell v. ESCO, 549 So.2d 840 (La.1989) and Stobart v. State through DOTD, 617 So.2d 880 (La.1993).
When the opinion testimony of an expert witness is based on assumed facts which are not proven by other competent evidence, the expert testimony has no probative value and should be disregarded by the *1004 trier of fact. Brown v. Aetna Casualty & Surety Company, 96 So.2d 357 (La.App.2d Cir.1957); Thomas v. Petrolane Gas Service Ltd., 588 So.2d 711 (La.App.2d Cir.1991), writ denied, 590 So.2d 1201 (1992). See also La.Code Evid. art. 705.
Without Mohr's unsupported assumptions that the soil conditions were the same in 1986 as they were found to be in 1991, there is simply no factual basis in the record for the trial court's conclusions that Turner knew or should have known the soil was unsuitable for construction, and that he placed the foundation footings or grade beams in the "gray foreign material," in violation of his contractual duty to have the beams placed at least six inches into undisturbed natural soil. Compare Wurst v. Pruyn and Matthews v. Rudy, both cited supra.
The court's findings regarding the contractual requirement to verify soil conditions for structural safety are somewhat incongruous, in our view. All witnesses agreed that the soil conditions were to be verified by the party who designed the foundation, in this case McDaniel, the engineer hired by Turner. The trial court found on the one hand that Turner breached his contract with Williams by not taking a soil boring from the lot, but concluded on the other that there was no evidence of substandard engineering conduct on McDaniel's part, notwithstanding that McDaniel did not take a soil boring.
Viewing only the proven facts which appear in the record, and disregarding the unproven facts which formed the basis for Mohr's opinion testimony, we must conclude that the record simply does not support the trial court's findings that Turner breached his express and implied obligations to Williams under the building contract and under C.C. art. 2762 by placing the foundation footings into the gray clayey "foreign material" in 1986. The one fact that the footings were found to have been in the gray clayey soil in 1991 does not, in the absence of other supporting facts, allow the conclusion that Turner placed them there in 1986. Compare these cases in which the building contractor's substandard performance was established by the testimony of witnesses who were present at the construction site: Greneaux v. Castle I, Inc., 404 So.2d 309 (La.App. 3d Cir.1981); Ragusa v. Ply-Woods, Inc., 170 So.2d 254 (La.App. 4th Cir.1964), writ denied, 247 La. 413, 171 So.2d 667 (1965).

DECREE
Reversing the amended judgment in favor of Williams against "Robert A. Turner, individually, and the community of acquets and gains which exists between Robert A. Turner and Judy Cook Turner," we render judgment dismissing the third party demand of Williams against Turner with prejudice. Costs are assessed to the appellees, Mr. and Mrs. Williams.
REVERSED AND RENDERED.